**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ROBERT SAMPSON, | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | |
| | : | JURY TRIAL DEMANDED |
| STONY BROOK UNIVERSITY; and | : | |
| MAURIE MCINNIS, in her official capacity | : | |
| as President of Stony Brook University, | : | |
| | : | |
| Defendants. | : | |

## COMPLAINT

Plaintiff Robert Sampson ("Sampson") is a gifted joint-degree student in good standing who is currently enrolled at both Stony Brook University's Renaissance School of Medicine and its College of Business. Although Stony Brook requires students who are pursuing only a degree in medicine to complete a medical degree in seven years, no such requirement applies to students pursuing joint degrees.

Sampson is a student with a disability who receives extended time on examinations. He must take a national board exam administered by the National Board of Medical Examiners ("NBME"), which has repeatedly refused to provide him with the same testing accommodations that Stony Brook provides him on examinations. Sampson has been forced to take extended leaves of absence while pursuing the accommodations that he needs on the NBME exam.

Although Stony Brook admits that Sampson needs the testing accommodations that he seeks from the NBME, it has refused to give him the time necessary to obtain the required testing accommodations from NBME. Stony Brook has informed Sampson that it will soon dismiss Sampson from the medical program for not being able to graduate within seven years despite the fact that he passed all of his classes, received stellar performance reviews in recent clinical

rotations, and has earned a 4.0 average in his masters' degree classes. Stony Brook's stated intent

to dismiss Sampson is discrimination based on disability in violation of Title II of the Americans

with Disabilities Act, 42 U.S.C. § 12131 *et seq*., and section 504 of the Rehabilitation Act, 29

U.S.C. § 794.

An injunction is necessary to preserve the status quo so that Sampson can maintain his

eligibility to sit for the NBME examinations.  An essential eligibility requirement for taking the

NBME examination is current enrollment in a medical school; if Stony Brook dismisses him

from its program, he will no longer be eligible to even take the board exam for which he seeks

accommodations, and his medical career will be over before it has even started despite his

successful academic performance, years of paying tuition to Stony Brook, and dedicated hard

work.  Sampson also seeks declaratory relief and damages including but not limited to economic

costs to redress the harms he has suffered, as well as reasonable attorneys' fees and costs.

## Jurisdiction, Parties, and Venue

1.       Sampson is a citizen of the state of New York and is a joint-degree student in

medicine and business administration at Stony Brook University ("Stony Brook).

2.       Stony Brook is a public university that is part of the State University of New York

system, with its main campus at 100 Nicolls Road, Stony Brook, NY 11794.

3.       Stony Brook is a recipient of significant Federal financial assistance in multiple

forms from multiple federal agencies. Stony Brook has accepted more than $32 million from the

United States Department of Health and Human Services, more than $21.8 million from the

United States Department of Defense, more than $19 million from the Small Business

Administration, more than $15.1 million from the National Science Foundation, more than $14.5

million from the United States Department of Energy, and significant funds from multiple other

federal agencies such as a grant from the United States Department of Veterans Affairs has a

current award value in the amount of $1,986,840.92 and a potential award value of $6,022.898.46.

4.      These many millions of dollars Stony Brook received and continues to receive were and are all conditioned on a promise by Stony Brook to the federal government not to discriminate on the basis of disability.

5.      Maurie McInnis is the President of Stony Brook, and she is being sued in her official capacity only.

6.      Sampson's claims against Stony Brook arise under Title II of the ADA, 42 U.S.C. §§ 12131 *et seq.*, and under section 504 of the Rehabilitation Act, 29 U.S.C. § 794.  This Court has jurisdiction of this action under 28 U.S.C. §§ 1331 and 1343(a)(4).

7.      Venue is proper because the events giving rise to this lawsuit occurred within this District and Stony Brook is located in this District.

## FACTS

8.      Robert Sampson has successfully completed three out of four years of medical education.

9.      Although his education was interrupted as the result of his disability and need for accommodations, he is 40 weeks away from completing his medical education.

10.     Sampson is a joint-degree student in good standing at both Stony Brook's School of Medicine and its College of Business.

11.     Sampson is a gifted student. His grade point average in his business school classes to date is a straight 4.0.

12.     Sampson is likewise a gifted medical student who shows promise of being a well-prepared and compassionate doctor. In his third-year clinical rotations, just recently completed in 2021, Stony Brook's medical faculty and preceptors penned glowing evaluations of Sampson,

saying Sampson was an "excellent student" who is "highly compassionate", "looked for ways to help", showed "great enthusiasm", and was "an asset to our team". They further described Sampson as "extremely dedicated to his patients", "thoughtful," and a "pleasure to work with".

13.    In his recent surgical rotation, preceptors wrote that even when cases ran late and Sampson could have left, he "insisted on staying and finishing with the team." They reported that Sampson "exhibits an advanced understanding of surgery for his level and consistently portrays a natural sense of curiosity, which is apparent in his thoughtful questions."

14.    Of his readiness to move into his fourth and final year of medical school, these Stony Brook faculty and preceptors said that Sampson's "medical knowledge and ability to assimilate this knowledge was impressive for his level of training" and "above expected for the level of training", and predicted that Sampson "will transition well into his clerkship year."

15.    In addition to and separate from his dedication to his studies, Sampson on his own invented not one but two life-saving medical systems for which he received two patents from the United States Patent and Trademark Office.

16.    All of Sampson's accomplishments were achieved as an individual with a disability.

17.    Sampson is diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") and learning disabilities that cause substantial impairment in the major life activities of thinking, concentrating, reading, learning, and taking standardized exams.

18.    Sampson has spent a lifetime requiring accommodation and/or mitigating measures to overcome these challenges.

19.     He began years of speech and language therapy at the age of four. In grammar school, though bright, his mother read assignments to him because he struggled with reading comprehension and focusing.

20.     His educational record is notable each year as far back as kindergarten for difficulties in focus, attention, comprehension, and timely completion of tasks. For example, his second-grade teacher noted that Sampson's difficulty in focusing caused him to struggle with comprehension. Likewise, his fifth-grade teacher noted that his grades were impacted by his inability to complete assignments. Sixth-grade teachers also noted that his susceptibility to distraction interfered with assignment completion.

21.     During elementary school, he required both tutors and a reading specialist. In fact, Sampson relied heavily on tutors throughout his education and worked hard – harder than his peers – to learn and demonstrate mastery of the material learned.

22.     In college, Sampson avoided classes with heavy reading and his grades varied widely because of the impact of his disabilities.

23.     Educational testing confirms the reports of Sampson's teachers all the way back to elementary school and his own experiences.

24.     For example, neurocognitive testing in 2013 documented that when faced with a complex reading task, Sampson was only able to complete half of the task in the allotted time as compared to the general population.

25.     Contrary to popular, cultural misperceptions, students with ADHD suffer significant impairments, facing real, disability-based barriers to demonstrating their knowledge. This is true for gifted students who are twice exceptional insofar as they are both gifted and a student with a disability.

26.     Likewise, students with learning disability face significant and real disability-based barriers that require accommodations.

27.     Students with both ADHD and learning disabilities find the interplay of these two disabilities to be devastating – reading is more difficult and labored, requiring focus that the student does not have because of ADHD.

28.     As the result of supportive parents, a host of tutors, dedication, work ethic, mitigating measures, and a bright mind, Sampson earned admission to and matriculated at Stony Brook's Renaissance School of Medicine.

29.     When Sampson entered medical school on August 12, 2015, he hoped that the mitigating measures he had relied on for a lifetime would be sufficient to overcome the challenges imposed by his ADHD and learning disabilities, but this was not the case.

30.     During orientation, he and his classmates were advised that all that was required for them to progress from year to year and successfully complete medical school was to pass all classes. Indeed, Power Point presentations shown to Sampson and his classmates at orientation specified that classes in the medical school were Pass/Fail.

31.     Sampson has passed all of his medical school classes to date.

32.     Although he passed his classes, he did not have time to finish reading all of the questions on the examinations and therefore was not able to demonstrate the fullest extent of his knowledge of medicine.

33.     Stony Brook approved him to continue on to his second year of medical education.

34.     Stony Brook's Renaissance School of Medicine has a committee appointed by its Faculty Senate called the Committee on Academic & Professional Progress ("CAPP

Committee"). The CAPP Committee makes decisions about academic standing and professional progress.

35.     In his second year of medical school, Sampson came to the attention of the CAPP Committee as the result of his advocacy on behalf of his class in regard to when students in his class year should be required to take and pass the first part of the United States Medical Licensing Examination.

36.     The United States Medical Licensing Examination ("USMLE") is a three-step test administered by an outside entity called the National Board of Medical Examiners ("NBME"). Although all allopathic physicians must pass each step of the USMLE to gain licensure, when and even if medical students need to take each part of the three-step test varies from medical school to medical school. Stony Brook, for example, requires that its medical students pass Step 1 and Step 2 Clinical Knowledge to be conferred a medical degree.

37.     Sampson advocated that students in his class year be permitted to take Step 1 of the USMLE after completion of their third year of medical school rather than after their second year of medical school.

38.     After polling his classmates about their preferences in regard to the timing of taking Step 1 of the USMLE and receiving over 92% response rate to his survey, Sampson met with Dr. Chandran, the Vice Dean for Academic Affairs and a member of the CAPP Committee to discuss his proposal that his class year be given a choice in regards to the timing of when they must take Step 1 of the USMLE.

39.     Dr. Chandran was opposed to Sampson's proposal that his class year be able to choose the timing of Step 1, but nevertheless directed Sampson to raise the proposal with the CAPP Committee.

40.     On November 3, 2016, Sampson did so, leading a student group asking the CAPP Committee to change the school policy requiring that a student sit for Step 1 at the end of their second year, to offer them the option of instead taking Step 1 at the end of their third year after completing clinical rotations.

41.     Sampson's advocacy on behalf of his classmates was successful, and on November 4, 2016, the CAPP Committee voted to allow his class the right to take Step 1 after third-year clinical rotations.

42.     However, two and half weeks after this vote in favor of Sampson's proposal over the objection of the CAPP Committee chair, the CAPP Committee for the first time raised concerns about Sampson's performance back in his first year of medical school.  The CAPP Committee raised these new concerns almost nine months after the alleged concern arose and three days before final exams midway through his second year of medical school.

43.     The CAPP Committee asserted that Sampson exhibited academic marginality even though he had passed all his classes.  The CAPP Committee's assertion was based on arithmetic errors that it refused to correct even when the mathematical errors were called to its attention.  Notably, this was the first time Sampson had ever been told about marginality either as a general concept or as applied to him individually.

44.     For the first time being told his passing grades were nonetheless "marginal" and not having had enough time to read and understand all of the questions on an NBME shelf exam, Sampson recognized that he had no choice but to request the extended time accommodations he needed because of his disability.  He applied for testing accommodations from Stony Brook's Disability Support Services.

45.     Stony Brook Disability Support Services concluded based upon review of Sampson's neurocognitive evaluations that Sampson has disabilities that require accommodations and approved him to begin receiving time and half (50% additional time) on all testing.  Stony Brook's Learning Specialist documented that with time and a half, Sampson had more time to demonstrate his knowledge of medicine and his performance on shelf exams improved significantly.

46.     Just days later, on December 7, 2016, the CAPP Committee, despite being aware of Sampson's disability and need for accommodations as a result of those disabilities, informed Sampson that he would be required to either 1) repeat the entire first year and a half of medical school despite having passed all his classes, or 2) take the Step 1 exam immediately, and then if he failed, he would need to repeat the entire first year and a half of medical school.  Other students were not required to take Step 1 at this point in time—Sampson had just won the right for his classmates to take Step 1 after the completion of third year clinicals.

47.     Retaking the first year and half of medical school not only would have caused significant harm to Sampson who had passed all his classes the first time he took them, but it also would have enriched Stony Brook by three extra semesters of tuition.

48.     The CAPP Committee advised Sampson he could appeal this decision to the medical school dean. He promptly did so and alerted the Dean that the CAPP Committee had miscalculated his grades and that he was not in fact a student with marginal status.  The medical school dean acknowledged Sampson's points and directed the CAPP Committee to reconsider its decision.

49.     In January of 2017, the CAPP Committee, having considered Sampson's timely filed appeal, rejected Sampson's appeal and reiterated its prior decision.

9

50.     Meanwhile, Sampson again timely filed an appeal with the Dean, but in February 2017, the Dean responded that there was no right of appeal from the CAPP Committee decision.

51.     Faced with the unenviable and demoralizing choice of paying Stony Brook to repeat a year and a half of medical school he had already passed or take Step 1 in advance of other students at his medical school, Sampson registered to take Step 1 and researched how to apply for the accommodations his evaluating specialists and Stony Brook agreed he needed from the NBME for Step 1.

52.     Sampson filed a request for accommodation with the NBME and had no choice but to wait for the NBME's accommodation decision.  In the meantime, he was not permitted to continue with medical school classes and was forced to take a leave of absence.

53.     The NBME has a long history of denying medical students' well-documented requests for accommodation.  For example, in *Ramsay v. NBME*, a court entered a preliminary injunction requiring the NBME to provide the medical student with her needed accommodations. *Ramsay v. Nat'l Bd. of Med. Exam'rs*, 968 F.3d 251 (3d Cir. 2020).  Likewise in *Berger v. Nat'l Bd. of Med. Exam'rs*, the Court entered a preliminary injunction requiring the NBME to provide accommodations to a student with ADHD and learning disabilities.  Case No. 1:19-cv-99, 2019 U.S. Dist. LEXIS 145666 (S.D. Ohio Aug. 27, 2019).

54.     While students without disabilities can register for the USMLE and take the test almost immediately, students with disabilities must wait for accommodations decisions that can take many months and frequently need to submit appeals or obtain additional testing that can be extraordinarily expensive and take months or even years to accomplish.  Some students, particularly those with ADHD and learning disabilities, have been forced at the end of extensive appeals to pursue federal litigation against the NBME that can in turn take years.

10

55.     In Sampson's case, after delay, NBME rejected his request for accommodations.

56.     As all too many students with documented disabilities must do, Sampson appealed the denial of his needed accommodations by the NBME.  Without necessary accommodations – accommodations Stony Brook Disability Support Services has said he needs, he could not take Step 1 and demonstrate his knowledge, particularly when he was being required to take the test at an earlier point in his medical education than his peers.

57.     Meanwhile, on July 17, 2017, Sampson was again notified the CAPP Committee was meeting "to discuss the issues pertaining to your delay in taking the USMLE Step 1 exam."

58.     Following a meeting of the CAPP Committee held in August 2017 without Sampson present, the CAPP Committee advised Sampson that he must either immediately start medical school over or take and pass the USMLE Step 1 on his first attempt, in time to complete medical school in seven years.

59.     Sampson persisted in seeking the accommodations he needed because of his disabilities from the NBME, but the NBME unlawfully rejected each of his appeals and requests for reconsideration, despite Sampson having furnished extensive documentation supporting his need for accommodations.

60.     From 2017 through 2019, the NBME rejected Sampson's requests for accommodations six times despite the documentation of his disability and the fact that Stony Brook itself stated that Sampson needs the testing accommodations he requested for the USMLE Step 1 exam.

61.     In an effort to comply with Stony Brook's demands after the NBME rejected his requests for accommodations on the USMLE, Sampson took Step 1 of the USMLE in January of 2020, without the accommodations he needed.  Without the extended time he needed because of

disability, Sampson was unable to substantively complete significant portions of the exam and resorted to guessing vastly as the clock ran out.  He failed the exam.

62.     The CAPP Committee invited him to appear again just as Covid hit and there was delay in conduct of the CAPP Committee meeting as a result.

63.     In June of 2020, Sampson appeared before the CAPP Committee by Zoom and the CAPP Committee asked Sampson to provide a reason why he should not be dismissed from medical school because of his failure to take and pass the USMLE Step 1 without accommodations.  Notably, it was not possible by this time to complete medical school in seven years.

64.     During this meeting, Sampson attempted to explain that he was continuing to advocate for the accommodations he needed from the NBME, that he needed to obtain additional testing to convince the NBME of what his doctors and Stony Brook Disability Support Services knew his disability required.

65.     The Americans with Disabilities Act (ADA) requires testing entities to provide accommodations.  *See* 42 U.S.C. § 12189. Likewise, ADA regulations provide that professional licensing examinations such as the USMLE must be administered so as to "best ensure" that results measure the individual's knowledge rather than the extent of his disability.  *See* 28 C.F.R. § 36.309(b)(1).

66.     Despite the CAPP Committee's own obligation not to discriminate on the basis of disability or to rely on the discriminatory actions of other entities, CAPP Committee made gravely discriminatory statements to Sampson during the June 2020 meeting.

67.     Dr. Larson, then Chair of the CAPP Committee, said of Sampson needing accommodations from the NBME, "I don't believe that this is the only way you could pass that exam.  You're not the first student who's ever had a learning disability and won't be the last."

68.     In response, Sampson asked, "Can I ask why I'm not getting the opportunity to continue to pursue the accommodations I need for the test that we're talking about?"

69.     Dr. Larson responded, "You just simply have refused to acknowledge that they're not going to give it to you."

70.     When Sampson attempted to again explain that he could not demonstrate his subject matter knowledge without accommodations because of his disabilities, Dr. Larson responded, "Do you believe you are the only person in the world who has had this problem?"

71.     The CAPP Committee thereafter voted to dismiss Sampson from medical school because he could not at that time complete his education in seven years given the CAPP Committee's own refusal to recognize his disability, need for accommodations, and the NBME's refusal to provide the testing accommodations that he needs to demonstrate his knowledge of medicine.

72.     Counsel intervened on Sampson's behalf and submitted a letter to the dean of the medical school appealing Stony Brook's decision.  This appeal specifically advised that dismissing Sampson from medical school under these conditions would be discrimination in violation of federal law.  When counsel received no response, it escalated the matter in June 2020 with a letter to Susan Blum, the General Counsel for Stony Brook.

73.     On July 13, 2020, Stony Brook overturned the CAPP Committee's decision and allowed Sampson to re-enroll.  Even though at the time of his re-enrollment, it was not possible

for him to complete his medical education in seven years, Sampson was finally permitted to resume his medical education.

74.     During the time he was barred from continuing his medical education, Sampson received his first patent on a medical system.  For a medical student with patents, a Master of Business Administration offered obvious benefits.  With the knowledge and support of his medical school, Sampson became a joint-degree (MD/MBA) student taking classes both as a medical student and as a business student.

75.     Meanwhile, Stony Brook executed and signed a certification that Sampson would graduate from medical school in May 2023, which was beyond the seven-year period.

76.     It is common practice for medical schools to grant modifications from seven-year requirements when necessary to ensure that students have the accommodations needed to demonstrate their knowledge on NBME exams.

77.     In reliance on Stony Brook's revocation of its discriminatory CAPP Committee decision, Sampson enrolled and continued his medical education.  Sampson excelled in both his business school classes, earning straight As, and in his medical school clinical rotations, receiving exemplary performance reviews.

78.     Sampson underwent additional educational testing in hopes of demonstrating to the NBME his need for extended time, a need that Stony Brooks Disability Support Services termed "imperative."

79.     Sampson underwent comprehensive testing by Dr. Jeannette Wasserstein, a clinical neuropsychiatrist and assistant clinical professor of psychiatry at Mt. Sinai Medical School.

80.     As had prior evaluations, this new evaluation underscored Sampson's very real and significant need for extended testing time.  Dr. Wasserstein administered a battery of tests and concluded that Sampson had both very significant ADHD and learning disabilities. The results were consistent with prior testing.  She described Sampson has having "significant handicaps on tasks that rely on perceptual reasoning and working memory, such as reading comprehension."  Tests showed both his reading rate and reading fluency as being significantly deficient. His reading rate on difficult material was at the lowest percentile.  When answering questions within the normal time limit on one inventory, for example, he was able to answer only 12 of 38 questions in the time allotted.  With double time, he was able to answer all questions, and answered all but one question correctly.

81.     Dr. Wasserstein found severely impaired sustained visual attention, which would be expected to impact performance on lengthy standardized exams.  She also found significant difficulty with tasks that rely on visual processing and would be even more pronounced under timed testing conditions.

82.     Dr. Wasserstein diagnosed significant reading comprehension issues resulting from the combination of diagnoses including complex reading disorder with dysgraphia with impaired visual processing and other memory and learning deficits.  She found clear deficits in sustained attention, executive function, memory and learning ability and visual-motor integration.  These deficits were not just between Sampson's Superior/Very Superior intellect and test performance, but were also absolute deficits as compared to the general population.

83.     Dr. Wasserstein strongly advised that double time was needed as an accommodation in testing as well as extended breaks between test segments.

15

84.     Stony Brook Disability Support Services reviewed the test results and granted Sampson double time on testing.

85.     In October 2021, Sampson received an email from the new dean, asserting that he must graduate in seven years despite the fact that he had been re-enrolled at a time when Stony Brook had stated that it was not possible for him to finish in seven years.

86.     The new dean's position was in direct contradiction to the decision of the prior dean allowing Sampson to re-enroll (and pay Stony Brook tuition) and continue his medical education even though he already by then could not have completed his medical degree in seven years.

87.     The new dean's position was also in direct contradiction to the Stony Brook policy that specifies that the seven-year policy does not apply to joint-degree students like Sampson.

88.     Specifically, Stony Brook's policy states,

All requirements for the MD degree must be met within seven (7) years after the date of first enrollment in the School of Medicine, or within five (5) years for a student who transfers into the School of Medicine after the first year.  *This time limitation does not apply to students in conjoint degree (e.g., MD/PhD) or other approved programs, e.g., a concurrent or consecutive MPH, MBA, MA degree…*

*See* https://renaissance.stonybrookmedicine.edu/ugme/policies (emphasis added) (last visited July 29, 2022).

89.     Stony Brook knew, because its own learning and disability support specialist repeatedly said so, that Sampson's disability requiring extended time on the USMLE was "significant" and real.

90.     After the new dean's surprising email telling Sampson that he must graduate within seven years even though it was impossible for him to do so, when Stony Brook permitted

16

him to return for third-year clinicals, Sampson's counsel sought clarification and discussions with Suzanne Shane, Stony Brook's Associate General Counsel.

91.     In the meantime, Sampson continued his classes and at long last obtained the results of the additional testing for submission to the NBME, which provided yet additional support for his need for extended time.

92.     After a long silence, Stony Brook finally responded to counsel again stating that Sampson must graduate in seven years.

93.     On March 21, 2022, Sampson's counsel again wrote Stony Brook pointing out that (1) the seven-year limitation was, by Stony Brook's own policy, not applicable to joint-degree students like Sampson, that (2) Stony Brook had permitted him to resume classes in July 2020 even though it knew by then that he could not complete medical school within seven years , and (3) a modification from any seven-year policy was necessary and reasonable in light of Sampson's disability and need for testing accommodations from the NBME.

94.     In this letter specifically requesting additional time to complete his medical degree as a modification for his disability, counsel for Sampson alerted Stony Brook to legal precedent supporting the reasonableness of such additional time as a modification required under federal disability law.

95.     Despite knowledge of such precedent, Stony Brook again stated that Sampson must finish his medical education within seven years.

96.     Seven years runs August 12, 2022.

97.     Absent intervention from the Court to protect Sampson's rights, he will be withdrawn from medical school despite stellar performance in clinicals and his dreams of

becoming a doctor – dreams he has doggedly pursued at the expense of significant time and resources – will end on or about August 12, 2022.

98.     If Sampson is dismissed from medical school, he will no longer be eligible to sit for the Step 1 examination for which he has been pursuing accommodations, since a requirement of sitting for the examination is current enrollment in medical school.

99.     In June 2022, the NBME denied Sampson's most recent request for accommodations.  Counsel is actively pursuing necessary testing accommodations and is in direct communication with the NBME to determine whether litigation is necessary for Sampson to receive the accommodations he needs.  However, once he is no longer a student in good standing, Sampson will no longer be eligible to even request accommodations from the NBME.[1]

100.    Sampson has been harmed insofar as Stony Brook prevented him from progressing with his education due to late-asserted, retaliatory, and incorrect claims of marginality, voted to withdraw his enrollment for discriminatory reasons, reneged on its own reversal of the discriminatory withdrawal, and denied Sampson modification from a seven-year policy that by its own terms does not even apply to Sampson.

101.    At risk is Sampson's entire future – a student described by Stony Brook's own preceptors as compassionate, dedicated, and gifted, and a student Stony Brook's own Disability Support Services describes as having an imperative need for accommodation on the USMLE.

---

[1] The USMLE's policies relating to eligibility to take the exam provides, "If you are dismissed or withdraw(n) from medical school, you are not eligible for the USMLE, even if you are appealing the school's decision or are otherwise contesting your status."  *See* https://www.usmle.org/bulletin-information/eligibility (last accessed on July 29, 2022).

102.    Sampson has suffered humiliation, frustration, and embarrassment at not being given an opportunity equal to that of students without disabilities to demonstrate the extent of his knowledge and medicine and progress through his education.

103.    Sampson has lost earnings and suffered economic and other harms as the result of Stony Brook's discriminatory conduct.

104.    Stony Brook has repeatedly acted with discriminatory intent, including deliberate indifference.

## COUNT I – TITLE II OF THE AMERICANS WITH DISABILITIES ACT

105.    The foregoing paragraphs of this Complaint are incorporated herein by reference.

106.    Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

107.    Stony Brook is a public entity.

108.    Sampson is an individual with a disability within the meaning of the ADA because his ADHD and learning disabilities are substantial impairments to the major life activities of thinking, concentrating, reading, learning, and taking standardized exams.

109.    Sampson is a qualified individual with a disability.

110.    Sampson is unable to complete his education within seven years because of his disability, because of Stony Brook's discrimination, and because he needs time to pursue his requests for the accommodation from the NBME.

111.    Stony Brook has discriminated and continues to discriminate with deliberate indifference against Plaintiff on the basis of his disabilities by imposing a seven-year restriction

on graduation from medical school even though this policy does not apply to Sampson and he needs additional time as a reasonable modification to ensure that he has the accommodations needed to take the NBME exams.

112.    Notably, entities cannot excuse their own discrimination by reliance on the discrimination of others.

113.    Sampson has been harmed and continues to suffer harm, including economic damages as the result of Stony Brook's actions.

114.    Sampson will be irrevocably harmed absent an injunction to stop Stony Brook from unilaterally withdrawing him from medical school and ending his medical career.

## COUNT II – VIOLATION OF THE REHABILITATION ACT

115.    The foregoing paragraphs of this Complaint are incorporated herein by reference.

116.    Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("section 504"), prohibits discrimination against people with disabilities in any "program or activity receiving Federal financial assistance."

117.    Section 504 of the Rehabilitation Act mandates that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

118.    Section 504 regulations require universities such as Stony Brook to make reasonable modifications as "are necessary to ensure that such requirements do not discriminate or have the effect of discriminating, on the basis of handicap, against a qualified handicapped applicant or student."  34 C.F.R. § 104.44(a).

119.    Section 504 regulations further provide that reasonable modifications may "include changes in the length of time permitted for the completion of degree requirements."  34 C.F.R. § 104.44(a).

120.    Stony Brook is a program or activity that receives Federal financial assistance.

121.    Stony Brook accepted millions of dollars of Federal financial assistance conditioned on a promise not to discriminate on the basis of disability.

122.    Sampson is an individual with a disability because his ADHD and learning disabilities substantially limit his ability to think, concentrate and perform on timed assessment absent mitigating measures and accommodations.

123.    Sampson is a qualified individual with a disability.

124.    Sampson has passed all of his medical school classes and received glowing reviews for his clinical rotations.

125.    Stony Brook's imposition of the seven-year rule that is plainly inapplicable to Sampson is discrimination in violation of section 504.

126.    Stony Brook's refusal to grant reasonable modification from its supposed seven-year rule is discrimination in violation of section 504.

127.    Stony Brook acted and is acting with deliberate indifference.

128.    Sampson has been harmed and continues to suffer harm, including economic damages as the result of Stony Brook's actions.

129.    Sampson will be irrevocably harmed absent Court intervention.


WHEREFORE, Sampson seeks judgment against Stony Brook as follows:

A.      For preliminary and permanent injunctions enjoining and restraining Stony Brook
from withdrawing him from medical school and denying him modification to the
seven year policy;

B.      For a declaratory judgment that Sampson has the right to continue as a medical
student in good standing because he requires additional time to complete his
medical degree as the result of Stony Brook's discriminatory actions against
Sampson and the denial of accommodations by the NBME;

C.      For damages, including but not limited to economic damages, non-economic
damages, and nominal damages;

D.      For the costs of suit and reasonable attorneys' fees; and

E.      For such other further relief as the Court shall deem just.

                    Respectfully submitted,


                    s/Mary C. Vargas
                    Mary C. Vargas
                    Michael Steven Stein
                    STEIN & VARGAS LLP
                    10 G Street NE, Suite 600
                    Washington, DC  20002
                    Tel: (240) 793-3185
                    Fax: (888) 778-4620
                    mary.vargas@steinvargas.com
                    michael.stein@steinvargas.com

                    Attorneys for Plaintiff

**Demand for Jury Trial**

Plaintiff demands a trial by jury with respect to all issues triable of right by jury.


/s/     Mary C. Vargas
Mary C. Vargas

Attorney for Plaintiff