**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

ROBERT SAMPSON,               :
                                          :

        Plaintiff,             :

                                            :   CIVIL ACTION NO.

        v.               :

                                            :   JURY TRIAL DEMANDED

STONY BROOK UNIVERSITY; and  :
MAURIE MCINNIS, in her official capacity  :
as President of Stony Brook University,  :

                                            :

        Defendants.        :

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION**

## I.    INTRODUCTION

Robert Sampson is an individual with learning disabilities and Attention Deficit
Hyperactivity Disorder.  He is 40 weeks away from receiving an MD/MBA from Stony Brook
University where he receives disability-related accommodations that include extended time on
examinations.  Sampson has passed all of his medical school classes, received excellent
evaluations for his third-year clinical rotations, and achieved a straight 4.0 in his MBA classes.
His clinical preceptors have commended him for his thorough knowledge of medicine, his
dedication, and his compassion in providing patient care.

Despite all his hard work and academic success, however, Sampson is at imminent risk of
being expelled from medical school.  Stony Brook has denied his request for time to pursue the
very same accommodations on national board exams that Stony Brook itself provides him.
Sampson needs to take an examination administered by the National Board of Medical
Examiners (NBME) in order continue onto his last 40 weeks of medical school, but the NBME
has refused to provide him with the testing accommodations that Stony Brook says he needs.

1

Sampson has been forced to take extended leaves of absence, during which time he filed seven requests for accommodations with the NBME, and was each time denied the accommodations that he needs on account of his disability.  As a result of these forced leaves of absence, he will not be able to complete medical school in seven years, even as he has passed on his first try every class and every clinical at Stony Brook.  Stony Brook, which has a policy of permitting dual-degree students such as Sampson to take more than seven years to finish medical school, has nevertheless informed Sampson that because he cannot complete medical school in seven years, it will dismiss him from the medical school.

Sampson has retained counsel with respect to his claims against the NBME for disability discrimination, and if the NBME will not agree to provide the necessary accommodations imminently, he will be forced to file suit against the NBME.  In the interim, Sampson files this preliminary injunction against Stony Brook for the limited purpose of maintaining the *status quo*—his status as an enrolled medical student.  The NBME only permits currently enrolled students to sit for examinations, and if Stony Brook expels Sampson from its program, he will no longer be eligible to sit for the NBME examinations and his medical career will be over before it even began.  Sampson therefore files this limited motion for preliminary injunction in order to maintain his eligibility to sit for the NBME examination and obtain the accommodations that Stony Brook itself admits that he needs for the examination.

## II.      FACTUAL BACKGROUND

Robert Sampson is diagnosed with Learning Disorder with Impairment in Reading and attention deficit hyperactivity disorder (ADHD).  Ex. A, Sampson Decl. at ¶¶ 4, 65-67.  According to a neuropsychiatrist at Mount Sinai who performed comprehensive educational

testing on Sampson, Sampson's significant reading comprehension issues result from the combination of diagnoses including complex reading disorder with dysgraphia with impaired visual processing and other memory and learning deficits.  Ex. B, Wasserstein Report, at 13-25. Sampson has significant impairment on tasks that rely on perceptual reasoning and working memory, such as reading comprehension.  *Id.*  Despite being intellectually gifted, both his reading rate and reading fluency are significantly deficient.  For example, Sampson's reading rate on difficult material tested at the 1st percentile, or below 99% of the general population.  *Id.* at 16.  Sampson also has clear deficits in sustained attention, executive function, memory and learning ability, and visual-motor integration.  *Id.* at 17-22.  Sampson's severely impaired sustained visual attention impacts performance on lengthy standardized exams.  *Id.* at 24-25.  For all of these reasons, Sampson needs testing accommodations to ensure that examinations measure his knowledge rather than the extent of his disabilities.

Sampson began medical school in August 2015.  Ex. A, Sampson Decl. at ¶ 14.  At orientation, Sampson and his classmates were told that they only needed to pass their classes to progress.  *Id.* at ¶ 15. Sampson managed to pass all his classes but his grades did not reflect his knowledge because without the extended time he needs because of his disabilities, he did not have enough time to read all the questions on examinations.  *Id.* at ¶¶ 17-18; Ex. C, Unofficial Transcript; Ex. D, Course History.

Having passed his first-year classes, Sampson progressed into his second year of medical school.  Ex. A, Sampson Decl. at ¶ 19. He took a leadership role among his classmates advocating for his class to take the first part of the United States Medical Licensing Examination (USMLE), called Step 1, at the end of the third year of school rather than at the end of their second year of school.  *Id.* at ¶¶ 21-26.  Sampson polled his classmates, and with a 92% response

rate, learned that his classmates overwhelmingly preferred taking Step 1 at the end of the third

year when students have more medical knowledge.  *Id.* at ¶ 24.  Sampson presented this proposal

to the medical school administration and then appeared, along with other students, before the

medical school's Committee on Academic & Professional Progress (CAPP Committee).  *Id.* at

¶¶ 24-26.  Sampson's advocacy was successful.  *Id.* at ¶ 27. The CAPP Committee, over the

objections of a key member and vice dean, agreed to permit students in Sampson's class to take

Step 1 after their third year of medical school.  *Id.* at ¶¶ 25, 27.

However, just a few weeks later, the CAPP Committee hauled Sampson in and informed

him for the first time that his academic performance the prior year had been "marginal".  *Id.* at

¶¶ 28-29. This came as a complete surprise to Sampson who passed all of his classes during his

first year of medical school and was nearly finished with the first semester of his second year of

medical school.  *See id.*  The CAPP Committee's claim that Sampson's performance the prior

year had been "marginal" was based on simple arithmetic mistakes but, regardless of any claim

of marginality, Sampson had passed all his classes.  *Id.* at ¶ 29; Ex. C; Ex. D.  The dean later

acknowledged errors, but Sampson was unable to seek correction of these errors because the

CAPP Committee raised its concerns long after the time period for correcting the calculation

errors had passed. Ex. A, Sampson Decl. at ¶¶ 29, 36.

While the timing of the CAPP Committee's concern was suspect, Sampson took the

alleged concern seriously.  Sampson recognized that he had no choice but to request the extended

time accommodations he needed because of his disability.  He applied for testing

accommodations from Stony Brook's Disability Support Services[1] and Stony Brook agreed that

---

[1] Stony Brook's Disability Support Services is now called Student Accessibility Support
Center.  Ex. A, Sampson Decl. at ¶ 31.

he qualified for and needed extended testing time to show his knowledge on examinations. *Id.* at ¶¶ 30-32.

However, just days after Stony Brook determined that Sampson needs accommodations, the CAPP Committee concluded that Sampson must stop his progress in medical school. *Id.* at ¶ 34. He was given the "choice" of starting medical school over and retaking all the classes that he had already passed, or taking Step 1 immediately even though he had just successfully persuaded the school to allow his classmates to wait until after the third year of medical school to take Step 1. *Id.* at ¶¶ 27, 34-35. The CAPP Committee told him that if he failed Step 1, he would be required to start medical school all over again. *Id.* at ¶ 34. Students who take the examination earlier in their medical careers, are less likely to pass for the simple reason that they have less medical knowledge at the time of testing. *See* Ex. E, Meeks Decl. at ¶ 11-12. Sampson appealed the CAPP Committee's decision but ultimately Sampson was told he had no right to appeal the CAPP Committee's determination. Ex. A, Sampson Decl. at ¶¶ 36-38.

Thereafter, Sampson was forced to take a leave of absence while attempting to comply with the CAPP Committee's directive that he take Step 1 at that point if he did not want to repeat three semesters of medical school that he had already passed. Sampson submitted his application to take Step 1 and requested that the NBME provide the same accommodations for Step 1 that Stony Brook had determined that he needs for examinations. *Id.* at ¶¶ 39-40; Ex. F, Letter from Stony Brook to NBME.

The NBME, however, has a long history of denying medical students' well-documented requests for accommodation. Ex. E, Meeks Decl. at ¶¶ 8-10. For example, in *Ramsay v. NBME*, a court entered a preliminary injunction requiring the NBME to provide the medical student with ADHD and learning disabilities her needed accommodations. *Ramsay v. Nat'l Bd. of Med.*

5

*Exam'rs*, 968 F.3d 251 (3d Cir. 2020).  Likewise in *Berger v. NBME*, the Court entered a preliminary injunction requiring the NBME to provide accommodations to a student with ADHD and learning disabilities.  Case No. 1:19-cv-99, 2019 U.S. Dist. LEXIS 145666 (S.D. Ohio Aug. 27, 2019).

While students without disabilities can register for the USMLE and take the test almost immediately, students with disabilities must wait for accommodations decisions that can take many months and frequently need to submit appeals or obtain additional testing that can be extraordinarily expensive and take months or even years to accomplish.  Ex. E, Meeks Decl. at ¶¶ 8-10. Some students, particularly those with ADHD and learning disabilities, have been forced at the end of extensive appeals to pursue federal litigation against the NBME just to obtain access to the most basic and routine testing accommodations.  *Id.* at ¶ 8.

Although Stony Brook described Sampson's need for testing accommodations for his disability as imperative, the NBME denied his requests for accommodations.  Ex. A, Sampson Decl. at ¶¶ 39-41.  Sampson was trapped.  He was forced to remain on leave of absence until he could take and pass Step 1, but he could not take and pass Step 1 without basic testing accommodations.

In January 2020, after the NBME six times denied his requests for accommodation, Sampson tried taking the examination without the accommodations he needed, and failed the examination because he did not have enough time to read all of the questions and demonstrate his mastery of the material.  *Id.* at ¶¶ 45, 47.

Thereafter, the CAPP committee called Sampson back and stated its intent to dismiss him from medical school.  *Id.* at ¶¶ 48, 50.  Sampson explained the dilemma that he faced in trying to get the NBME to approve the necessary accommodations.  The CAPP committee said it was

aware of his disability but stated that he needed to learn how to succeed without accommodations. *Id.* at ¶¶ 50-55. Specifically, when Sampson tried to explain that he needed to obtain additional testing related to his disability to provide to the NBME, the chair of the CAPP Committee said—contrary to Stony Brook's own Disability Support Services and learning specialist—"I don't believe that this is the only way you could pass that exam. You're not the first student who's ever had a learning disability and won't be the last." *Id.* at ¶¶ 51-52. When Sampson responded, "Can I ask why I'm not getting the opportunity to continue to pursue the accommodations I need for the test that we're talking about?", the CAPP Committee chair replied, "You just simply have refused to acknowledge that they're not going to give it to you" and "do you believe you are the only individual in the world who has attempted to take Step 1 with this particular disability?" *Id.* at ¶¶ 53-55. The CAPP Committee thereafter voted to dismiss Sampson from medical school. *Id.* at ¶ 56.

Sampson appealed to the dean of the medical school and the university president, pointing out that his forced leave of absence was discriminatory as was the requirement that he pass Step 1 in order to continue with medical school even though other students were not required to take Step 1 until after the end of the third year. *Id.* at ¶ 57; Ex. G, Letter from Counsel dated May 29, 2020; Ex. H, Letter from Counsel dated June 5, 2020. Stony Brook overturned the CAPP Committee's decision and allowed Sampson to proceed with his medical education. Ex. A, Sampson Decl. at ¶ 58.

By this point, it was impossible for Sampson to complete medical school in seven years, and Stony Brook's decision to nonetheless let him continue with his medical studies necessarily required waiving the requirement that he graduate within seven years of starting medical school.

The registrar's office certified that his expected graduation was in May 2023, nearly eight years after he started medical school.  *Id.* at ¶ 60; Ex. I, Certification from Stony Brook Registrar.

While on forced leave of absence and awaiting decisions from the NBME, Sampson strove to use his time as best he could.  While preparing and submitting extensive packets documenting his disabilities to the NBME, he invented not one but two life-saving medical systems for which he has now received patents from the United States Patent and Trademark Office.  Ex. A, Sampson Decl. at ¶ 59.  This experience caused Sampson to apply for admission to Stony Brook's MBA program with the medical school's knowledge and support.  *Id.*  To date, Sampson has earned a straight 4.0 average in the MBA program. Ex. C; Ex. D.

When Sampson returned to medical school after more than a three-year leave of absence, he excelled in his clinical rotations, earning recognition from his preceptors for his outstanding performance in clinicals in 2020 and 2021.  Sampson's clinical preceptors penned glowing evaluations of Sampson, saying he was an "excellent student" who is "highly motivated and compassionate", "looked for ways to help", showed "great enthusiasm", and was "an asset to our inpatient team".  Ex. A, Sampson Decl. ¶ 61 and exhibit cited therein.  They further described Sampson as "extremely dedicated to his patients", "thoughtful," and a "pleasure to work with". *Id.*  Of his readiness to move into his fourth and final year of medical school, these same Stony Brook faculty and preceptors said that Sampson's "medical knowledge and ability to assimilate this knowledge was impressive for his level of training", and "above expected for the level of training". *Id.*

Sampson completed his third year of medical school in 2021, and now had the same number of years of medical school as his classmates did when sitting for the Step 1 examination. *Id.* at ¶¶ 27, 80.  Because the NBME requires new testing to prove disabilities every three years,

Sampson was forced to obtain costly and comprehensive testing relating to his disability, a task made more difficult by COVID.  *Id.* at ¶ 62.  Sampson had no choice but to again take a leave of absence from medical school while seeking accommodations from the NBME.  During this time Stony Brook submitted a certification to the NBME confirming Sampson's need for the disability-related testing accommodations.  *Id.* at ¶ 74.

Meanwhile, in October 2021, Sampson received an email from the new dean of the medical school informing Sampson that he still expected Sampson to complete medical school in seven years.  *Id.* at ¶¶ 70-71; Ex. J, Email Chain Between Dean Wackett and Robert Sampson. Sampson pointed out (1) Stony Brook had permitted him to return to school in August of 2020 when graduation in seven years was already not possible based on a determination that his forced leave of absence had been discriminatory, (2) Stony Brook's registrar had certified that his graduation date was May 2023, more than seven years after he started his medical education, and (3) he was a joint-degree student.  Ex. J, Email Chain Between Dean Wackett and Robert Sampson; Ex. K, Stony Brook Policy, at § 2.5 (stating that the seven-year requirement does not apply to joint-degree students).  In response, Stony Brook again asserted that Sampson must graduate by August 2022.  Ex. J., Email Chain Between Dean Wackett and Robert Sampson. Notably the medical school does not even hold graduations in August. Ex. A, Sampson Decl. at ¶ 70.

Sampson retained counsel in an attempt to resolve this matter short of litigation.  Ex. L, Letter from Counsel dated October 27, 2021.  His counsel communicated with Stony Brook's counsel and, in March 2022, formally requested as an accommodation for his disability that the school permit Sampson the time needed to obtain the Step 1 accommodations that Stony Brook acknowledged that he needed in order to demonstrate his knowledge of medicine.  Ex. M, Letter

from Counsel dated November 19, 2021; Ex. N, Letter from Counsel dated March 21, 2022.

Stony Brook, through counsel, summarily denied this request.  Ex. O, Letter from Shane dated

April 1, 2022.  Stony Brook stated that Sampson no longer had until May 2023 to graduate, and

now instead had only until August 2022 to graduate.  Ex. J, Email Chain Between Wackett and

Robert Sampson; Ex. O, Letter from Shane dated April 1, 2022.  Stony Brook stated that if

Sampson did not graduate by August 2022, it was going to dismiss him from the program.  Ex. J,

Email Chain Between Dean Wackett and Robert Sampson.

In June 2022, NBME again rejected Sampson's request for accommodations that Stony

Brook said he needed.  Ex. A, Sampson Decl. at ¶ 82.  Thereafter, Sampson's counsel

communicated its intent to file suit against the NBME to obtain the necessary accommodations.

Ex. P, Letter from Counsel to NBME.

If Sampson is dismissed from medical school in August 2022 as Stony Brook has stated

its intention to do, he will no longer be eligible to take the Step 1 examination, since only

enrolled students may sit for this board examination.  Ex. Q, NBME Eligibility Policy, at 1.

Therefore, if Stony Brook dismisses Sampson, he will no longer be eligible to take the NBME

and will be precluded from obtaining the necessary testing accommodations to demonstrate his

mastery of medical knowledge on the examination.  Sampson has therefore filed this limited

preliminary injunction to enjoin Stony Brook from dismissing him so that he can pursue his legal

remedies against NBME and obtain the accommodations Stony Brook says he needs.


### III.    LEGAL ARGUMENT

A party seeking a preliminary injunction in the Second Circuit must establish: "(1)

irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious

questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; and (3) that a preliminary injunction is in the public interest."  *Green Haven Prison Preparative Mtg. of Religious Soc'y of Friends v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 78 (2d Cir. 2021).  These elements are taken up in turn.

### A.  Sampson Can Demonstrate Sufficiently Serious Questions Going to the Merits of His Claims and Is Likely To Prevail on His Claims

Congress enacted the Americans with Disabilities Act ("ADA") "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."  42 U.S.C. § 12101(b)(1).  Title II of the ADA accordingly states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

Section 504 of the Rehabilitation Act similarly provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).

The ADA and section 504 are interpreted in similar fashion and analyzed together, requiring universities to make reasonable modifications for a student's known disability unless such modification would result in undue burden or fundamental alteration.  *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 186-87 (2d Cir. 2015).  To establish a prima facie case, a plaintiff must demonstrate (1) that he is a qualified individual with a disability; (2) that the defendant is subject to the ADA or section 504; and (3) that he was

"denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of [his] disability." *Id.* at 187 (citations and quotation marks omitted).  Since Stony Brook provides Sampson with testing accommodations and has recognized that he needs these accommodations on NBME examinations, and Stony Brook is a public university receiving federal financial assistance, only the third element is at issue in this case.

Relevant to this case, the United States Department of Education has promulgated section 504 regulations stating that universities "shall make such modifications to its academic requirements as are necessary to ensure that such requirements do not discriminate or have the effect of discriminating, on the basis of handicap, against a qualified handicapped applicant or student."  34 C.F.R. § 104.44(a).  The Department of Education has specifically stated that such required modifications "*may include changes in the length of time permitted for the completion of degree requirements.*"  *Id.* (emphasis added); *see also, e.g.*, *Wong v. Regents of the Univ. of Cal.*, 192 F.3d 807, 820 (9th Cir. 1999) (quoting 34 C.F.R. § 104.44(a)).

As the Second Circuit has explained, the student has a "light burden of producing evidence as to the facial reasonableness or plausibility of the accommodation" requested and then "the burden falls to the defendant educational-institution to persuade the fact-finder that the proposed accommodation is unreasonable."  *Dean*, 804 F.3d at 190.  Undue burden and fundamental alteration are affirmative defenses for which the defendant bears the burden of proof.  *See, e.g.*, *Colo. Cross Disability Coalition v. Hermanson Family Ltd. Pship.*, 264 F.3d 999, 1005-1006 (10th Cir. 2001).

Courts have explained that universities may not hide behind the cloak of academic deference in shielding discriminatory actions from judicial review.  Universities must

demonstrate that they carefully considered requests for accommodations and diligently researched accommodations that would not result in undue burden or fundamental alteration. *See, e.g.*, *Dean*, 804 F.3d at 191.  A university's history of previously providing the requested accommodations is strong evidence of the reasonableness of those accommodations.  *E.g.*, *Wong*, 192 F.3d at 820 ("The fact that the school previously made the exact modification . . . is certainly persuasive evidence from which a jury could conclude that the accommodation was reasonable.").

The case law is replete with cases holding that it is a reasonable modification for medical schools and other health sciences programs to provide extended time for students with disabilities to take board examinations when necessary to ensure that the board examinations measure the extent of the students' knowledge of medicine rather than the extent of the students' disabilities.  Such extension of time is a reasonable modification even when it results in the student needing additional time to complete the degree program.  *See* 34 C.F.R. § 104.44(a) (stating that universities may be required to modify graduation timelines to accommodate student disabilities); *Wong*, 192 F.3d at 820 (citing 34 C.F.R. § 104.44(a) and noting that a jury can find that additional time is a reasonable modification).

In *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178 (2d Cir. 2015), the Second Circuit held that a medical school discriminated against a student with a disability by refusing to modify its policies and procedures to allow him to take the Step 1 examination with accommodations.  The medical school had a policy of providing students three opportunities to pass Step 1 within a year of completing the second year of classes.  *Id.* at 182. After the medical student failed the Step 1 examination for the second time, he suffered depression and had to undergo treatment.  *Id.* at 183.  The medical school extended several times

the deadline for him to retake Step 1, but then refused further extensions. *Id.* at 183-84. As a result, the medical student did not have sufficient time on account of his disability to study for Step 1, and did not sit for the exam. *Id.* at 184. Thereafter, the medical school dismissed the student from the program, and NBME rejected the student's subsequent registration for the examination since he was no longer enrolled in a medical school. *Id.* at 185. The Second Circuit held that the student's leave request on account of his depression "was a plausible modification" of the university's policies and that the university had failed to demonstrate that it had diligently considered whether the student's leave request would result in undue burden or fundamental alteration. *Id.* at 191.

Similarly, in *Shaik v. Tex. A&M Univ. Coll. of Med.*, 739 F. App'x 215 (5th Cir. 2018), the Fifth Circuit held that a medical school discriminated against a student with a disability who experienced debilitating symptoms as a result of a tumor and was not able to adequately prepare for Step 1 and therefore failed the examination. Although the student had passed all his classes and completed third-year rotations with honors, he had been dismissed from the program. *Id.* at 216. After being dismissed, he was not able to retake Step 1 because he was not an enrolled student. *Id.* at 217. The medical school told him he could apply for readmission to medical school in order to retake Step 1, but then would not let him reenroll because he "was not an acceptable applicant and that he was a liability for psychiatric reasons." *Id.* at 216-17. The Fifth Circuit held that the student could establish disability discrimination because his disability plausibly caused his failure to retake Step 1 when he was unable to do so as an unenrolled student and the medical school's disparaging statements suggested that his disability was the reason for refusing to reenroll him. *Id.* at 223.

In *Doe v. Samuel Merritt Univ.*, 921 F. Supp. 2d 958 (N.D. Cal. 2013), the court granted a motion for preliminary injunction requiring a podiatry school to maintain the student with a disability's student status while he took the equivalent of Step 1 for podiatry students.  The school had a "three-strikes rule" and the student was administratively dismissed after failing for the third time.  *Id.* at 961.  Once dismissed, the student was ineligible to take the test again since the outside testing entity required that test-takers be enrolled students.  *Id.* at 962.  The court rejected the podiatry school's claim that permitting the student to retake the examination would result in fundamental alteration, noting that there was nothing in the record to suggest that the school had fulfilled its obligation to explore alternatives for accommodating the student.  *Id.* at 969.  Accordingly, the student had raised "serious questions" as to whether the accommodations request was a reasonable modification.  *Id.* at 969-70.

In *J.C. v. Rowan Univ. Sch. of Osteopathic Med.*, Civil No. 17-2778 (RBK/KMW), 2018 U.S. Dist. LEXIS 9153 (D.N.J. Jan. 17, 2018), the district court held that a medical student could establish disability discrimination when he became disabled and the medical school refused to allow him the necessary extended time to prepare for an osteopathic board examination because doing so would run up against the medical school's five-year graduation policy.  *Id.* at *3-6, 10.  Following dismissal, the student was unable to retake the board exam because he was not an enrolled student.  *Id.* at *6.  The court held that the student was an otherwise qualified individual with a disability because he had achieved passing grades but had been denied reasonable modifications for him to continue with his medical education.  *Id.* at *9.  The court rejected as a "red herring" the medical school's argument that the student should have sued the board examiners for testing accommodations, noting that the medical school had the authority to grant the student additional time to take the test with accommodations.  *Id.* at *9-10.

As these cases demonstrate, medical schools must make reasonable modifications short of undue burden or fundamental alteration to ensure that individuals with a disability have a fair opportunity to take national board examinations.  When students have disabilities that require accommodations for them to prepare for and take board examinations on an even level with non-disabled students, medical schools must make reasonable modifications such as providing extended time to study for the examinations.  *E.g.*, *Dean*, 804 F.3d at 190-91; *see also McCoy v. E. Va. Med. Sch.*, Civ. A. No. 2:11cv494, 2012 U.S. Dist. LEXIS 25777, at *3-5 (E.D. Va. Feb. 28, 2012) (student's inability to retake Step 1 in timely manner and complete his degree in the required timeframe was the result of the medical school's failure to accommodate).  Medical schools may not dismiss students with disabilities who have failed board examinations by reason of their disability without the ability to demonstrate the true extent of their knowledge of medicine, and in the process, deprive the students of the necessary student status to sit for the board examinations with the accommodations they need.  *E.g.*, *Shaik*, 739 F. App'x at 217, 223, *Doe,* 921 F. Supp. 2d at 971-72, *J.C.*, 2018 U.S. Dist. LEXIS 9153, at *9-10.

Sampson can readily establish that his case presents "serious questions" and that he is likely to succeed on the merits.  Stony Brook has recognized Sampson as an individual with a disability and provided him with testing accommodations on medical school examinations. Stony Brook also submitted documentation to the NBME stating that Sampson needs extended time on the Step 1 examination.  The reason Sampson has not been able to take Step 1 with the accommodations Stony Brook admits that he needs is because the NBME has refused his requests for such accommodations.  Sampson's request for accommodation from Stony Brook is modest: that he be permitted to maintain his student status while he exhausts his legal options against NBME in seeking the accommodations that Stony Brook has determined are necessary

for him to demonstrate his knowledge of medicine.  For these reasons, Sampson is able to meet his "light burden" of establishing that the modification that he seeks is reasonable. *See Dean*, 804 F.3d at 190-91.

There are "serious questions" whether Stony Brook can meet its burden of demonstrating that permitting Sampson to take Step 1 with the accommodations he needs would be a fundamental alteration.  As described, Department of Education section 504 regulations specifically provide that universities may be required to make "changes in the length of time permitted for the completion of degree requirements" in order to accommodate students with disabilities.  34 C.F.R. § 104.44(a); *Wong*, 192 F.3d at 820.

Moreover, Stony Brook's conduct demonstrates that the seven-year requirement is flexible.  Stony Brook permitted Sampson to resume his third-year of medical school after a forced three-year leave of absence even though by then it was impossible for him to finish medical school within seven years, and the registrar's office had even put his anticipated graduation as May 2023, nearly eight years after he began medical school.  Stony Brook also explicitly permits medical students to take more than seven years to finish medical school if they are dual-degree students, and Sampson is such a dual-degree student.  By the terms of Stony Brook's own policies, the seven-year time limitation does not apply to Sampson.

Most troublingly, the CAPP Committee has mocked Sampson's disability and need for accommodations by saying, "do you believe you are the only individual in the world who has attempted to take Step 1 with this particular disability" and "how has everyone else passed, and not you?"  The CAPP Committee indicated it wanted to dismiss Sampson because it did not think students with disabilities could get testing accommodations for the board exams.  The attitude of the CAPP Committee towards Sampson is similar to that of the medical school dean

17

in *Shaik* that considered the medical student there "a liability for psychiatric reasons" and not an acceptable student on account of his disability—an attitude that the Fifth Circuit held to be evidence of discrimination. *Shaik*, 739 F. App'x at 223. Stony Brook's attitude towards Sampson and refusal to accommodate his need for testing accommodations is unworthy of deference. *See, e.g.*, *Dean*, 804 F.3d at 191 (declining to award academic deference when doing so might "allow academic decisions to disguise truly discriminatory requirements"); *Doe*, 921 F. Supp. 2d at 969-70 (declining to award academic deference at the preliminary injunction stage when there were "serious questions" whether a podiatry school discriminated against a student by refusing to let her maintain enrolled status in order to sit for a board examination).

This is not a case where a medical student failed classes or clinicals in medical school and seeks additional time as a result of academic nonperformance. This is rather, a case where Sampson passed all of his courses on his first try and excelled in his third-year clinical rotations. He has demonstrated to Stony Brook that he is academically capable, and merely seeks the opportunity to demonstrate that yet again on the board exams. His request for preliminary injunction is modest: that he be permitted to maintain his student status and exhaust all legal options against NBME in seeking the accommodations that Stony Brook itself said that he needs.

**B. Sampson Will Suffer Irreparable Harm If He Is Not Permitted To Seek the Necessary Accommodations to Take the Step 1 Examination**

In the context of higher education, courts regularly find irreparable harm when the refusal to permit a student to pursue a graduate degree would work irreversible harm to the student's ability to pursue his or her chosen profession. For instance, in *Enyart v. Nat'l Conference of Bar Examiners*, the Ninth Circuit affirmed the grant of a preliminary injunction requiring bar exam administrators to provide accommodations for a blind test-taker, explaining that the test-taker

18

had "demonstrated irreparable harm in the form of the loss of opportunity to pursue her chosen profession."  630 F.3d 1153, 1165 (9th Cir. 2011).

The case *Doe v. Samuel Merritt Univ.* is directly on point.  In that case, a podiatry student obtained a preliminary injunction requiring her program to maintain his status as an enrolled student so that she could take the podiatry equivalent of the Step exams.  The court held that without such an injunction in place, the student would be irreparably harmed because she would be "preclude[ed] from advancing her professional career."  921 F. Supp. 2d at 964; *see also, e.g.*, *Maczaczyj v. State of N.Y.*, 956 F. Supp. 403, 408 (W.D.N.Y. 1997) (irreparable harm when a student not permitted to continue in graduate school since such "exclusion will most likely affect plaintiff's ability to engage in the future employment of his choice"); *D'Amico v. N.Y. State Bd. of Law Exam'rs*, 813 F. Supp. 217, 220 (W.D.N.Y. 1993) (irreparable harm due to the lack of testing accommodations on bar exam, since without such accommodations, "a disabled person loses the chance to engage in a normal life activity").

In the specific context of medical students, courts find irreparable harm when a student is not permitted the accommodations necessary to take Step exams.  In *Ramsay v. Nat'l Bd. of Med. Exam'rs*, the Third Circuit affirmed the grant of a preliminary injunction requiring the NBME to provide accommodations to a medical student with a disability, noting that "[h]er termination from medical school and its consequences could not later be redressed" and the lack of accommodations would "jeopardize[] her 'opportunity to pursue her chosen profession.'"  968 F.3d 251, 262 (3d Cir. 2020) (quoting *Enyart*, 630 F.3d at 1166).

Sampson's medical education, graduation, profession, and financial wellbeing—his entire future—hang in the balance.  He cannot move forward without successfully completing Step 1, and for that he requires appropriate accommodations, as Stony Brook has itself determined.  If

Stony Brook dismisses him from the program and prevents him from sitting for the Step 1

examination, his medical career will be over before it began and he will suffer the sort of

psychological and dignitary harm that the ADA was enacted to prevent.  In *Berger v. Nat'l Bd. of

Med. Exam'rs*, the district court addressed this factual scenario, noting irreparable harm because

if the medical student were dismissed from medical school, he "would be foreclosed from taking

the exam again and be unable to practice his chosen profession of medicine."  2019 U.S. Dist.

LEXIS 145666, at *83-84.

Without a preliminary injunction to preserve his status as an enrolled student eligible to

take the Step exam, Sampson will be left without a remedy that will allow him to resume his

dream of becoming a doctor.  Since this is precisely the sort of injury that courts have held to be

irreparable harm, Sampson readily satisfies the requirement for irreparable harm.


### C.  The Balance of Hardships Strongly Favors Granting a Preliminary Injunction

The balance of hardships weighs strongly in favor granting a preliminary injunction

maintaining the status quo requiring Stony Brook to maintain Sampson's status as an enrolled

student while he pursues legal action against the NBME.

Stony Brook will not be harmed.  Sampson has excelled academically, passing all courses

and receiving outstanding evaluations for his third-year clinical rotations, and he looks forward

to demonstrating his mastery of medical knowledge on the NBME examinations with the testing

accommodations that Stony Brook itself has said that he needs.  As the court in *Doe v. Samuel

Merrit Univ.* noted, such an injunction "would involve only Defendant's minimal participation—

namely, granting Plaintiff inactive student status so she could sit for the exam."  921 F. Supp. 2d

at 971 (noting that Defendant could "identif[y] no hardship other than the alleged hardship in simply departing from its [policies]").

Further, Stony Brook's own actions demonstrate that the seven-year requirement is flexible.  When Stony Brook permitted Sampson to return from his first extended leave of absence, it did so while knowing that he could not complete medical school in seven years.  The registrar's office set his graduation for May 2023, nearly eight years after he first enrolled.  Further, pursuant to Stony Brook's own written policies, the seven-year limitation does not even apply to dual-enrolled students such as Sampson, who is also taking courses at the business school.  Stony Brook's medical school was aware of Sampson's dual enrollment because it submitted documentation to the business school in furtherance of his application to that program.  It will cost Stony Brook nothing to allow Sampson to maintain his status as an enrolled medical student while he pursues legal action against NBME – in fact it will gain more of his tuition dollars by doing so.

By contrast, Sampson's dream of becoming a doctor will be shattered if Stony Brook is permitted to dismiss him from the program despite his track record of academic excellence.  As described, if he is not an enrolled student, he will not be able to sit for the NBME examination, much less seek the testing accommodations that Stony Brook has said he needs for that examination.  For this reason, the balance of hardships tips strongly in favor of granting a preliminary injunction.

### D.  The Public Interest Favors Enforcing the ADA and Making It Possible for Qualified Individuals with Disabilities To Pursue Careers in Medicine

The enforcement of the ADA is in the public interest.  *E.g.*, *Enyart*, 630 F.3d at 1167.  Many areas of the United States are under-served by physicians, and so increasing the number of

physicians is in the public interest. *Ramsay*, 968 F.3d at 263. It is also in the interest of people with disabilities – estimated to total almost 13 percent of the total population of the United States[2] – to have the opportunity to be treated by people with life experiences that are more similar to their own experiences, *i.e.,* by people with disabilities. *See generally* L. Meeks and N. Jain, *Accessibility, Inclusion and Action in Medical Education* (Association of American Medical Colleges 2018) at 8.[3] This factor therefore points sharply in favor of granting a preliminary injunction so that Sampson has the opportunity equal to that of medical students without disabilities to demonstrate the true extent of his knowledge of medicine.

## IV.    CONCLUSION

Sampson's medical career now hinges not on his intellect, extraordinary hard work, and commitment he has demonstrated in the course of medical school or the heart and compassion that caused his clinical supervisors to praise his outstanding clinical skills, but on whether Stony Brook will allow him to maintain his status as an enrolled student while he pursues legal action against the NBME for not providing him with the testing accommodations that Stony Brook itself has said that he needs. For this reason, he seeks an order maintaining the status quo to allow him to sit for the NBME examination with the accommodations necessary to allow him to demonstrate his knowledge and skill under fair testing conditions.

---

[2] *See* 2017 Disability Statistics Annual Report (Institute on Disability, University of New Hampshire, 2018), at 2, *available at* https://disabilitycompendium.org/sites/default/files/user-uploads/2017_AnnualReport_2017_FINAL.pdf.

[3] Available for download from the Association of American Medical Colleges website, https://store.aamc.org/accessibility-inclusion-and-action-in-medical-education-lived-experiences-of-learners-and-physicians-with-disabilities.html.

The public interest strongly favors ensuring that individuals with a disability have an opportunity to demonstrate their knowledge and competence.  Sampson has raised sufficiently serious questions on the merits and is likely to prevail on the merits.  He is on the brink of being dismissed from medical school and being barred from even sitting for the Step 1 examination with accommodations.  The balance of hardships and public interest strongly militate in favor of granting a preliminary injunction.  Sampson accordingly requests that the Court grant a preliminary injunction preserving the status quo so that Sampson can obtain the necessary accommodations that Stony Brook has stated that he needs for the Step 1 examination.


DATED this 29th day of July 2022.

Respectfully submitted,


s/Mary C. Vargas
Mary C. Vargas, Esquire
Michael Steven Stein, Esquire
STEIN & VARGAS LLP
10 G Street NE, Suite 600
Washington, DC 20002
Tel. 240.793.3185
Fax 888.778.4620
mary.vargas@steinvargas.com
michael.stein@steinvargas.com

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

The foregoing has been filed via CM/ECF with copies sent via CM/ECF to all counsel of

record:

<u>s/Mary Vargas</u>
Mary Vargas

24