IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT SAMPSON, | : |
| | : |
| | : CIVIL ACTION NO. |
| v. | : |
| | : JURY TRIAL DEMANDED |
| STONY BROOK UNIVERSITY; and | : |
| MAURIE MCINNIS, in her official capacity | : |
| as President of Stony Brook University | : |

### DECLARATION OF ROBERT SAMPSON

I, Robert D. Sampson, make the following declaration upon personal knowledge:

### FACTS

1. I have successfully completed three out of four years of medical education at Stony Brook's Renaissance School of Medicine, and I am 40 weeks away from completing medical school.

2. In July 2021, I completed third-year clinical rotations. My preceptors spoke positively of my clinical performance. My preceptor's comments are attached as Exhibit A1.

3. I am also student in good standing in Stony Brook's College of Business where I have a 4.0 GPA.

4. I have achieved these accomplishments as an individual with Attention Deficit Hyperactivity Disorder ("ADHD") and learning disabilities that have required a lifetime of accommodations and mitigating measures so that I could be where I am today.

5. I have always had to work harder than my peers without disabilities but I am driven by the example of my grandfather who was an inventor, my father who is a surgeon, and my mother who is a dentist. I admire them all greatly and want them to be proud of me.

6. I began years of speech and language therapy at the age of four. In elementary school, my mother read assignments to me because reading comprehension and focus were already challenging for me at that age.

7. My teachers consistently noted my struggles with attention, focus, and reading. For example, my second-grade teacher noted that my difficulty in focusing caused me to struggle with comprehension. Likewise, my fifth-grade teacher noted that my grades were impacted by my inability to complete assignments. My sixth-grade teachers also noted that my susceptibility to distraction interfered with my ability to complete assignments.

8. During my k-12 education, I needed both tutors and a reading specialist and by the time of my graduation from high school I had worked with 24 tutors. It was not unusual to devote more than ten hours a week to tutoring in order to mitigate my disabilities.

9. In college, I avoided classes with heavy reading and my grades varied widely because of the impact of my disabilities.

10. A tutor who worked with me recommended I receive formal testing because of what he saw as clear learning differences and challenges that made reading laborious and slower than my peers.

11. In 2013, I underwent neurocognitive testing that showed the disabilities I had been trying to mitigate my whole life.

12. For me, the diagnoses initially offered both an explanation as to why I learned and performed differently than my peers and source of humiliation. I had not had any role models with disabilities and I worried that having disabilities rendered me not worthy or less than. I hoped that despite my disabilities I could succeed in pursuing my dreams.

13. As the result of supportive parents, a host of tutors, dedication, work ethic, and mitigating measures, I nonetheless earned admission to and matriculated at Stony Brook's Renaissance School of Medicine.

14. When I began medical school on August 12, 2015, I hoped that the mitigating measures I had relied on for a lifetime would be sufficient to overcome the challenges caused by my ADHD and learning disabilities, but this was not the case.

15. During orientation, my classmates and I were advised that the only requirement for progressing from year to year and successfully completing medical school, was passing all of our classes. The Power Point presentations at orientation stated that the classes in the medical school were Pass/Fail.

16. In medical school there was a mantra that was on constant repeat to my classmates and I. The mantra was "P=MD" or pass equals a medical degree.

17. To date, I have passed all of my medical school classes.

18. Although I have passed all of my classes, I did so despite not having the time to finish reading all of the questions on the examinations and not being able to demonstrate the true extent of my knowledge of medicine.

19. After I passed all of my first-year classes, Stony Brook approved me to continue on to my second year of medical school.

20. Stony Brook's Renaissance School of Medicine has a committee appointed by its Faculty Senate called the Committee on Academic & Professional Progress ("CAPP Committee"). The CAPP Committee makes decisions about academic standing and professional progress.

21.     In my second year of medical school, I interacted with the CAPP Committee as the result of my advocacy on behalf of my class with regard to when students in my class year should be required to take and pass the first part of the United States Medical Licensing Examination.

22.     The United States Medical Licensing Examination ("USMLE") is a three-step test administered by an outside entity called the National Board of Medical Examiners ("NBME"). Although all allopathic physicians must pass each step of the USMLE to gain licensure, when and even if medical students need to take each part of the three-step test varies from medical school to medical school. Stony Brook, for example, requires that its medical students pass Step 1 and Step 2 Clinical Knowledge to be conferred a medical degree.

23.     I advocated for students in my class year to be permitted to take Step 1 of the United States Medical Licensing Examination after completion of our third year of medical school rather than after our second year of medical school.

24.     After polling my classmates about their preferences in regard to the timing of taking Step 1 of the USMLE and receiving a 92% response rate to my survey, I met with Dr. Chandran, the Vice Dean for Academic Affairs and a member of the CAPP Committee to discuss my proposal that my class year be given a choice in regards to the timing of when we must take Step 1 of the USMLE.

25.     Dr. Chandran was opposed to my proposal that my class year be able to choose the timing of Step 1, but nevertheless directed me to raise the proposal with the CAPP Committee.

26.     On November 3, 2016, I did so, leading a student group asking the CAPP Committee to change the school policy requiring that a student sit for Step 1 at the end of their

second year to offer them the option of instead taking Step 1 at the end of their third year after completing clinical rotations.

27. My advocacy on behalf of my classmates was successful insofar as on November 4, 2016, the CAPP Committee voted to allow my class the right to take Step 1 after third-year clinical rotations.

28. However, two and half weeks after this vote in favor of my proposal over the objection of a key member of the CAPP Committee, the CAPP Committee for the first time raised concerns about my performance back in my first year of medical school. The CAPP Committee raised these new concerns almost nine months after the alleged concern arose and three days before final exams midway through my second year of medical school.

29. The CAPP Committee asserted that I exhibited "academic marginality" even though I had passed all my classes. The CAPP Committee's assertion was based on arithmetic errors that it refused to correct even when the mathematical errors were called to its attention. Notably, this was the first time I had ever been told about marginality either as a general concept or as applied to me in particular. Because the CAPP Committee raised this concern so late, the arithmetic mistake could not be corrected.

30. Although I had passed all of my classes to date despite not being able to finish reading all of the questions on the examinations, the suggestion that my academic performance was unacceptable led me to request the extended time accommodations that I needed because of my disability, but which I had been afraid to request up until this point.

31. I applied for testing and other accommodations Stony Brook's Disability Support Services which is now called Student Accessibility Support Services.

32. Stony Brook Disability Support Services concluded based upon review of my neurocognitive evaluations that I require accommodations and approved me to begin receiving time and half (50% additional time) on all testing.

33. Stony Brook's Learning Specialist documented the importance of the accommodations for me. My performance on shelf exams improved significantly with extended time.

34. A few days later, on December 7, 2016, the CAPP Committee, despite being aware of my disability and need for accommodations, informed me that I would be required to either 1) repeat the entire first year and a half of medical school despite having passed all of my classes, or 2) take the Step 1 exam immediately, and then if I failed, I would need to repeat the entire first year and a half of medical school.

35. No other student in my class was required to take Step 1 after just three semesters to prove that they still belonged in medical school; to the contrary, I had just helped my class persuade the CAPP Committee that no student should be required to take Step 1 until after the third-year of medical school.

36. The CAPP Committee advised me that I could appeal this decision to the medical school dean. I promptly alerted the dean that the CAPP Committee had miscalculated my grades and that, when my grades were properly calculated, I was not a student with marginal status. The medical school dean acknowledged that I had made valid points and directed the CAPP Committee to reconsider its decision.

37. In January of 2017, the CAPP Committee rejected my appeal and reiterated its prior decision.

38. Meanwhile, I again contacted the dean, but in February 2017, the dean responded that there was no right of appeal from the CAPP Committee decision.

39. I registered to take Step 1 and began researching how to apply for the accommodations my evaluating specialists and Stony Brook agreed were imperative for me to take Step 1.

40. I filed a request for accommodation from the NBME and had no choice but to wait for the NBME's accommodation decision. In the meantime, I was not permitted to continue with medical school classes and was forced to take a leave of absence.

41. The NBME, after a long delay, rejected my request for accommodations.

42. I appealed the NBME's denial of my request for accommodations to the NBME.

43. Meanwhile, on July 17, 2017, I was again notified that the CAPP Committee was meeting "to discuss the issues pertaining to your delay in taking the USMLE Step 1 exam."

44. Although I advised the CAPP Committee of my ongoing efforts to obtain the accommodations I needed to take Step 1 of the USMLE, following a meeting of the CAPP Committee held without me present, the CAPP Committee advised me that I must either immediately start medical school over or take and pass the USMLE Step 1 on my first attempt in time to complete medical school in seven years.

45. From 2017 through 2019, the NBME rejected my requests for accommodations six times despite the documentation of my disability and the fact that Stony Brook itself stated that I need the testing accommodations I requested for the USMLE Step 1 exam.

46. Submitting each request for accommodation was an enormous task and each rejection from the NBME was both terrifying and humiliating – to finally have the courage to

7

disclose my disability and ask for the help I needed only to be turned away left me emotionally struggling, anxious, and hopeless but I persisted because I want so much to be a doctor.

47. In January 2020, in an effort to comply with Stony Brook's demands after the NBME rejected my requests for accommodations on the USMLE, I took Step 1 of the USMLE without the accommodations I needed. I was unable to substantively complete a significant portion of the exam and resorted to guessing vastly as the clock ran out. I failed the exam.

48. The CAPP Committee, learning of this failure, invited me to appear again just as COVID hit and there was delay in conduct of the CAPP Committee meeting as a result.

49. In June of 2020, I appeared before the CAPP Committee by Zoom with my father by my side. My father is himself a surgeon and a medical professor and his presence and support are something for which I will always be grateful, but it also meant that he watched my humiliation.

50. The CAPP Committee asked me to provide a reason why I should not be dismissed from medical school because of my failure to take and pass the USMLE Step 1 without accommodations. Notably it was not possible by this time for me to take the USMLE Step 1 and complete medical school in seven years.

51. During this meeting, I explained that I was continuing to seek accommodations from the NBME for my disabilities and that I needed to obtain additional testing to convince the NBME of what my doctors and Stony Brook Disability Support Services knew my disability required.

52. Dr. Larson, then Chair of the CAPP Committee, said of my need for accommodations from the NBME, "I don't believe that this is the only way you could pass that exam. You're not the first student who's ever had a learning disability and won't be the last."

53. In response, I asked, "Can I ask why I'm not getting the opportunity to continue to pursue the accommodations I need for the test that we're talking about?"

54. Dr. Larson responded, "You just simply have refused to acknowledge that they're not going to give it to you."

55. When I attempted to again explain that I could not demonstrate my subject matter knowledge without accommodations because of my disabilities, Dr. Larson responded, "Do you believe you are the only person in the world who has had this problem?"

56. The CAPP Committee thereafter voted to dismiss me from medical school because I could not at that time complete my education in seven years given the CAPP Committee's own refusal to recognize my disability, my need for accommodations, and the NBME's refusal to provide the testing accommodations that I need to demonstrate my knowledge of medicine.

57. Counsel intervened on my behalf and submitted a letter to the dean of the medical school appealing Stony Brook's decision. This appeal specifically advised that dismissing me from medical school under these conditions would be discrimination based on disability in violation of federal law. When counsel received no response, it escalated the matter in June 2020 with a letter to the Susan Blum, the General Counsel for Stony Brook.

58. On July 13, 2020, Stony Brook overturned the CAPP Committee's decision that had kept me from progressing in medical school for more than 3 years and at long last allowed me to re-enroll. Even though at the time of my re-enrollment, it was not possible for me to complete my medical education in seven years, I was finally permitted to resume my medical education.

59. During the time I was barred from continuing my medical education I struggled to find meaning and to use my time productively. Using copious notes my grandfather left in filing cabinets of his quest for patents, I followed his example as best I could and had applied for a patent for a medical system I developed. I received my first patent and have since applied for and received a second patent on a medical system. Consequently, a Master of Business Administration offered obvious benefits. With the knowledge and support of my medical school, I became a joint-degree (MD/MBA) student taking classes both as a medical student and as a business student.

60. Meanwhile, Stony Brook executed a certification that I would graduate from medical school in May 2023, which was beyond the seven-year period.

61. In reliance on Stony Brook's revocation of its CAPP Committee decision, I enrolled and continued my medical education. I excelled in both business school classes, earning straight As, and in medical school clinical rotations, receiving exemplary performance reviews. See Exhibit A1 for a compilation of my performance reviews.

62. I had to undergo additional, expensive educational testing because the NBME requires new testing every three years and in hopes of demonstrating to the NBME my need for extended time, a need that Stony Brooks Disability Support Services termed "imperative." This was all made more difficult by factors relating to COVID.

63. It is difficult to put into words how demoralizing and difficult emotionally it was to again pursue accommodations with the words of the CAPP Committee – that I would never receive accommodations from the NBME - ringing in my ears.

64. I underwent comprehensive testing by Dr. Jeannette Wasserstein, a clinical neuropsychiatrist and assistant clinical professor of psychiatry at Mt. Sinai Medical School.

65. As had prior evaluations, this new evaluation underscored my need for extended testing time. Dr. Wasserstein administered a battery of tests and concluded that I have ADHD and learning disabilities that require accommodation. The tests showed both my reading rate and reading fluency as being significantly deficient. My reading rate on difficult material was at the lowest percentile. When answering questions within the normal time limit on one inventory, for example, I was able to answer only 12 of 38 questions in the time allotted. With double time, I was able to answer all questions, and answered all but one question correctly.

66. Dr. Wasserstein found that I have severely impaired sustained visual attention which would be expected to impact performance on lengthy standardized exams. She also found that I have significant difficulty with tasks that rely on visual processing and would be even more pronounced under timed testing conditions.

67. Dr. Wasserstein diagnosed me with significant reading comprehension issues resulting from the combination of diagnoses including complex reading disorder with dysgraphia with impaired visual processing and other memory and learning deficits. She found clear deficits in sustained attention, executive function, memory and learning ability and visual-motor integration. These were absolute deficits as compared to the general population.

68. Dr. Wasserstein strongly advised that double time was needed as an accommodation in testing as well as extended breaks between test segments.

69. Stony Brook Disability Support Services reviewed the test results and granted me double time on testing.

70. In October 2021, I received an email from the new medical school dean asserting that I must graduate in seven years despite the fact that I had been re-enrolled at a time when

Stony Brook stated it was not possible for me to finish in seven years. He indicated that I must graduate by August 2022, but the medical school does not even hold graduations in August.

71. The new dean's position was in direct contradiction to the decision of the prior dean revoking the CAPP Committee's decision and allowing me to re-enroll (and pay Stony Brook tuition) and continue my medical education even though I already by then could not have completed my medical degree in seven years.

72. It was also in direct contradiction to the Stony Brook policy that specifies that the seven-year policy does not apply to joint-degree students like me.

73. After I received the new dean's email telling me that I must graduate within seven years even though it was impossible for me to do so when Stony Brook permitted me to return for third-year clinicals, my counsel sought clarification and discussions with Suzanne Shane, Stony Brook's Associate General Counsel. It was terrifying to know that all my dreams were held in the balance.

74. In the meantime, I continued my classes and obtained the results of the additional testing for submission to the NBME which provided yet additional support for my need for extended time. Along with this most recent application for accommodations to the NBME, Stony Brook certified that I needed the accommodations I was requesting.

75. After a long silence, Stony Brook finally responded to my counsel again stating that I must graduate in seven years.

76. On March 21, 2022, my counsel again wrote Stony Brook pointing out that (1) the seven-year limitation was, by Stony Brook's own policy, not applicable to joint-degree students like me, that (2) Stony Brook had permitted me to resume classes in July 2020 even though it knew by then that I could not complete medical school within seven years , and (3) a

modification from any seven-year policy was necessary and reasonable in light of my disability and need for testing accommodations from the NBME.

77. In this letter specifically requesting additional time to complete my medical degree as a reasonable modification for my disability, my counsel alerted Stony Brook to legal precedent supporting the reasonableness of such additional time as a modification required under federal disability law.

78. Despite knowledge of such precedent, Stony Brook again stated that I must finish my medical education within seven years.

79. Seven years runs August 12, 2022.

80. Although I have successfully completed three years of medical school, absent intervention from the Court to protect my rights, I will be withdrawn from medical school despite my academic performance in classes and clinicals and I will no longer be able to pursue my dream of becoming a doctor.

81. If I am dismissed from medical school, I will no longer be eligible to sit for the Step 1 examination for which I have been pursuing accommodations, since a requirement of sitting for the examination is current enrollment in medical school.

82. In June 2022, the NBME denied my most recent request for accommodations. My counsel is actively pursuing necessary testing accommodations and is in direct communication with the NBME to determine whether litigation is necessary for me to receive the accommodations I need. However, once I am no longer a student in good standing, I will no longer be eligible to even request accommodations from the NBME.

83. I declare under the penalties of perjury that the foregoing is true and correct.

DATED: July 29, 2022

_____
Robert Sampson

# EXHIBIT A1

Course Name: "Introduction to Clinical Medicine - Odd Year"

Robert had an excellent performance in the ICM course. During his clinical bedside experiences, he demonstrated an excellent ability to gather relevant patient information and develop a differential diagnosis and work up plan. His medical knowledge and ability to assimilate this knowledge was impressive for his level of training and he always attempts to incorporate his classroom learning to the care of his patients. Finally, his communication skills were polished, his write ups were stellar and he was always professional. He had an excellent performance in small group, consistently contributing positively to the group discussion. His performance on the end of course OSCE was also excellent. Robert will transition well into his clerkship year.

Course Name: "Medicine"

**NARRATIVE DESCRIPTION OF CLINICAL PERFORMANCE:**
Robert Sampson completed his medicine clerkship at Stony Brook University Medical Center. Robert had an overall very good clinical performance during the clerkship. The faculty and house staff noted that Rob had a solid fund of knowledge and generated good differential diagnosis—often thinking outside the box. Faculty and house staff consistently noted that Robert asked intelligent questions. He demonstrated great enthusiasm for learning and improving clinical knowledge and patient care skills; to this end, he read the medical literature and shared new knowledge with team members. He was a very active member of the patient care team, and with his strong communication skills, he was able to work well in coordinating patient care with consultants.

In the small group preceptor sessions, the preceptor noted that Robert was very thorough and well thought out in his discussion of cases. He volunteered to do extra presentations, demonstrating his enthusiasm for learning and teamwork. He got along with team members very well and was very professional. He continued to show improvement in his presentations throughout the clerkship period.

Robert satisfactorily completed all the required elements for the clerkship. He passed the Final Essay exam and the NBME subject exam.

At the end of the clerkship, Robert was performing at the level of an interpreter for the Internal Medicine core conditions.

**Attending verbatim:**
Robert demonstrated enthusiasm for learning Medicine. He took care of a very complicated patient where he was very helpful in getting all the outside records, executing the plan from multiple sub specialty recommendations and doing a very good job at analyzing all the data to come up with a very good differential diagnosis and plan of care. He had good bedside manners, good communication skills, wrote good notes, asked very smart questions on rounds.

Exceptional ability to question clinical routines to engage himself and others in EBM.

He is a very motived student. Keep working on integrate the basic medical knowledge with real clinical practice.

**Resident verbatim**:

Rob is very proactive in his learning, readily and frequently reads up on his patients, looks up medical literature and shares new knowledge with the team. He has a good handle on his sick patients and has a solid knowledge base which allows him to formulate solid assessment and plans. He is also very engaged in the rest of the team's patients and frequently asks intelligent and great questions, and is always willing to help out.

Wow he has good differentials and is thinking outside the box.

**Intern verbatim:**
High intellectual curiosity- continue to keep asking questions. For differentials, always address biggest issues first, zebras second. For presentations, keep it focused and hit the main points, then at the end can bring up additional thoughts. High fund of knowledge for current level, continue reading!

Robert did a great job during this rotation. He was very active in the care of his patients, checking in on them often and gathering thorough histories. He demonstrated significant dedication to his patients and was always asking great questions. He was always willing to help out the team and offer his assistance.

**Patient care:** very good
**Medical knowledge:** very good
**Practice-based learning:** very good - excellent
**Communication skills:** very good
**Professionalism:** very good
**System based learning:** very good

**NARRATIVE DESCRIPTION OF PRACTICAL (H&P) EXAM PERFORMANCE:**
Robert had an overall excellent performance on his observed bedside history and physical examination. He was very respectful of the patient, expressed empathy where appropriate and needed. Hid data gathering was very organized and followed the appropriate sequence, and was sufficiently detailed. The physical exam was also very thorough and mostly accurate and elevated subtle findings. Robert's final formulation of differential diagnosis and management plan was very 'impressive"- it was appropriately broad, and the management plan was above expected for the level of training

**Interview Style and Communications Skills:** excellent
**Data Gathering Ability:** excellent
**Physical Exam:** excellent
**Formulation and Write Up:** outstanding

Course Name: "Primary Care"

Robert is an engaged medical student who shows significant motivation to learn and improve.  He has a professional appearance and shows good history taking and physical exam skills. He continued to progress over the weeks in his learning and knowledge levels, especially for conditions frequently seen in a primary care setting. He used cases seen in clinic to review diagnoses, clinical guidelines and evidence-based treatment plans.  He also began to engage in more critical thinking, planning and documenting involved in medical decision making as the rotation progressed. He would create differential diagnoses for presenting symptoms and use critical thinking to narrow the most likely diagnoses. He was reliable and willing to help with patient care. He will need to continue to get clinical exposure and experience for continued improvement and honing of his skills. Overall, he is functioning at the interpreter level.

Course Name: "Surgery"

Robert is a mature student who has drive and uses every opportunity as a chance to learn something.  He is engaged, enthusiastic and interested.  He is thoughtful and actively sought out ways to contribute to the team. Without being directed, he met patients in preop, ensured consents were filled out appropriately, and updated the team with patients' progress to the OR.  In the OR, Robert looked for ways to help. When cases ran late, he insisted on staying and finishing with the team. He routinely demonstrated great preparation and breadth of reading.  He exhibits an advanced understanding of surgery for his level and consistently portrays a natural sense of curiosity, which is apparent in his thoughtful questions. He completed thorough histories and physicals, and performed comprehensive yet succinct presentations with complete plans of treatment.  He is able to synthesize information at a higher level than many of his peers.  He would make a strong general surgery resident if that is the path he ultimately chooses.

Course Name: "Anesthesiology"

Robert was an excellent student and did a great job on his anesthesia rotation.  He showed upon time and was always eager to learn. He is inquisitive – asks relevant and high-level questions, active listening, and has a strong knowledge base. Robert pays attention to detail, and was an important part of the anesthesia team.  He will do well in whatever field he chooses to pursue.  Good job, and continue to learn!

Course Name: "Emergency Medicine"

This course is graded pass/fail only.  During the two-week rotation, Robert saw a variety of patients and was involved with performing several procedures.  In procedure lab, he was able to demonstrate proper techniques in laceration repair, bag mask ventilation, and endotraacheal intubation.
During his two-week rotation, Robert was super inquisitive.  He asked great questions and incorporated feedback.  He also took the initiative to look up information on interesting cases.  Robert was very eagar to see patients and was very helpful with their families and was very good with follow-up as well.  Overall Robert was a pleasure to work with; he will be an outstanding resident in whatever field he chooses.

Course Name: "Neurology"

Robert did a good job on Neurology. Smart, good knowledge base. Great advocate for his patients, goes the extra mile. Spent a lot of time with his patients. Would often text the team later after leaving the hospital when he thought more about a patient or to share more ideas. Helpful to team (e.g. called a German translator without being asked).Thinks outside the box.
Recommendations: Learn ideal times to ask questions. Try to focus on the big picture - at times would focus on aspects of the patient (could be imaging or psychosocial issues) that were not the most important issues to the case, but clinical judgment will likely come with more experience. Continue to be more receptive to feedback.
Submitted write-ups were brief.
Write-up #1 8.25/10
Write-up #2 8.25/10
Clinical 37.25/50
NBME 77%
OSCE 76.7%
Final Clerkship Score 76/100 Pass

Course Name: "Radiology"

Mr. Robert Sampson has successfully completed his rotation in the Department of Radiology at Stony Brook Medicine University Hospital.
Despite the challenges that COVID 19 has presented, Robert submitted a well-illustrated power point presentation on Gallstone Pancreatitis including a discussion of cholelithiasis, acute cholecystitis and secondary pancreatits with imaging examples on radiography and US.
His interesting case of Tracheoesophageal Fistula on radiographs including illustrations of its types and a table of the findings of VACTERL.
In lieu of a final exam, Robert submitted a thorough paper on Pulmonary Embolism Radiology and Management, which included the Modified Wells Criteria with excellent representative abnormalities on chest radiography with classic signs, and findings on V/Q scan and pulmonary CTA.

Course Name: "Psychiatry"

Robert Simson completed this rotation at Nassau University Medical Center (NUMC). He completed all the assignments and questions. As per his preceptor in the inpatient unit, it was evident that he was very dedicated in the field of medicine. He was a highly motivated and compassionate student. He illustrated himself in his desire to assure he was exposed to as much clinical situation as possible. He demonstrated good basic psychiatric knowledge. By the end of this rotation, he demonstrated competency in history taking, mental status examination, evaluation of suicide risk and alcohol and drug use. Overall, Robert had good clinical performance during this rotation.

Course Name: "Ob/Gyn"

Punctual, conscientious, attentive, professional. Team player, showed interest in cases, asked questions about interesting cases. Seemed selfless and empathetic. Researched his answers.  Patient care skills were strong, demonstrating complete plans, thorough differentials and well organized notes. His behavior modeled reliability, collegiality and integrity. He consistently sought out and accepted responsibility.

Course Name: "Pediatrics"

Mr. Robert Sampson was a clinical clerk in the Department of Pediatrics from May 31- July 11, 2021.  The following comments were provided in response to request for evaluation of Mr. Sampson by supervising faculty and residents: (1) "Great rotation in the newborn nursery! Very intellectually curious. Asks great questions. Reads about patients' issues and problems in more depth to increase his fund of knowledge".  (2) "Robert consistently took the initiative to seek out tasks and additional learning opportunities, at times going above and beyond expectations. Examples include following up on radiology results, which resulted in early identification of a venous sinus thrombosis in a patient that was later transferred to the ICU. Always thinking of a broad differential for patients and actively participating at evening signout".  (3) "Robert was an asset to our inpatient team.  He is extremely dedicated to his patients and went above and beyond in securing a much needed intervention for one patient in particular.  He demonstrates a high level of intellectual curiosity and his case presentations were consistently reflective of a comprehensive thought process".
Mr. Sampson's written and oral case discussions reflected evidence of his ability to use scientific literature effectively to enhance his medical knowledge.  His overall clinical score was 35.4/50, reflecting his ability to function as an **"Interpreter/Manager"** in patient care.  He has earned a grade of **"Pass"** in the Clerkship in Pediatrics with a total score of 78.9 out of 100 possible points.