UNITED STATES DISTRICT COURT                    <u>For Online Publication Only</u>
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
ROBERT SAMPSON,

                                    Plaintiff,          **<u>MEMORANDUM & ORDER</u>**
                                                        22-CV-04490 (JMA) (AYS)

                    -against-                           **FILED**
                                                        **CLERK**

STONY BROOK UNIVERSITY and MAURIE                       4:17 pm, Feb 07, 2024
McINNIS *in her official capacity as President of Stony*
*Brook University*,                                     **U.S. DISTRICT COURT**
                                                        **EASTERN DISTRICT OF NEW YORK**
                                    Defendants.         **LONG ISLAND OFFICE**
-------------------------------------------------------------------X

**AZRACK, United States District Judge:**

Presently before the Court is the motion by Plaintiff Robert Sampson for attorney's fees

and costs.  (<u>See</u> ECF No. 38.)  For the reasons set forth below, the motion is DENIED.

## I.     BACKGROUND

**A.     <u>Facts</u>**

**1.     Plaintiff's Medical School Enrollment, Performance, and Accommodations**

On August 12, 2015, Plaintiff enrolled in the Renaissance School of Medicine (the

"Medical School") at Stony Brook University ("Stony Brook").  (ECF No. 1 ¶¶ 10, 29.)  In late

November 2016, the Medical School's Committee on Academic & Professional Progress "raised

concerns about [Plaintiff]'s performance back in his first year of medical school," namely, that

Plaintiff's grades were "marginal."  (<u>Id.</u> ¶¶ 42-44.)  Plaintiff then recognized that the "mitigating

measures" he had been "rel[ying] on for a lifetime" to cope with his "Attention Deficit

Hyperactivity Disorder ('ADHD') and learning disabilities" were insufficient for his performance

in the Medical School.  (<u>Id.</u> ¶¶ 17, 29, 44.)  Thereafter, Plaintiff applied for testing accommodations

at the Medical School.  (<u>Id.</u> ¶¶ 44.)  As a result, the Medical School granted Plaintiff "50%

additional time" on all tests it administered.  (<u>Id.</u> ¶¶ 44-45.)

In December 2016 and January 2017, consistent with its Medical Student Academic Policies and Procedures Manual ("Policy Manual"), the Medical School required Plaintiff to (1) pass by May 31, 2017, "Step 1," which is the first of the three "Step" exams constituting the United States Medical Licensing Examination that doctors of medicine must pass to gain licensure, or (2) repeat the first eighteen months of Medical School coursework with his new testing accommodations. (See ECF No. 1 ¶¶ 36, 46-50; ECF Nos. 14-3, 14-4; see also ECF No. 14-1 §§ 1.1, 5.5.1, 9.2.1 (Policy Manual sections providing that students must abide by its terms, students may be required to retake courses in which they marginally performed, and students may be required take Step 1 within specified times).) Plaintiff took a leave of absence to take Step 1. (ECF No. 1 ¶ 52.) As explained further below, during this leave of absence, the Medical School extended the deadline for Plaintiff to take Step 1.

### 2. Plaintiff's Pursuit of Accommodations on Step 1

During his leave of absence from the Medical School, Plaintiff applied to nonparty National Board of Medical Examiners ("NBME"), the administrator of all three Step exams, for special accommodations on Step 1. (Id. ¶¶ 36, 52.) The Medical School provided written support for Plaintiff's requested accommodations from NBME. (See id. ¶ 36; ECF No. 3-7.) Nonetheless, "[f]rom 2017 through 2019, the NBME rejected [Plaintiff]'s requests for accommodations six times . . . ." (ECF No. 1 ¶ 60.) In June 2022, NBME rejected Plaintiff's final request for accommodations. (Id. ¶ 99.)

### 3. Plaintiff's Discussions with the Medical School During His Leave of Absence About the Seven-Year Graduation Policy and Step 1

On August 11, 2017, the Medical School informed Plaintiff that it extended the deadline by which Plaintiff must pass Step 1. (ECF No. 14-5.) The Medical School also reminded Plaintiff that, under the Policy Manual, Plaintiff must meet the school's graduation requirements within

2

seven years of his enrollment date (the "Seven-Year Graduation Policy").  (Id.; see also ECF No. 14-1 § 2.5.2 (Seven-Year Graduation Policy in the Policy Manual).)  At that point, the deadline under the Seven Year Graduation Policy, August 12, 2022, was five years away.

On July 17, 2018, Plaintiff reported to the Medical School that he had not passed Step 1, he retained legal counsel to assist in his pursuit of testing accommodations from NBME, and, though he hoped to be excepted from it, he understood the Seven-Year Graduation Policy.  (ECF No. 14-6.).  On August 7, 2018, the Medical School reaffirmed to Plaintiff that he must graduate by August 12, 2022, under the Seven-Year Graduation Policy.  (See ECF No. 14-7.)

On November 20, 2019, Plaintiff informed the Medical School that he planned to imminently take Step 1.  (ECF No. 14-8.)  Plaintiff reported that he understood the applicable "timeline."  (Id.)

In January 2020, Plaintiff took Step 1 without accommodations and failed the exam.  (ECF No. 1 ¶ 61.)

### 4.    Plaintiff's Return to Medical School & Continued Discussions About the Seven-Year Graduation Policy

On May 29, 2020, Plaintiff's counsel wrote to the Medical School seeking to exempt Plaintiff from the Seven-Year Graduation Policy.  (ECF No. 3-8.)  In that letter, Plaintiff's counsel confirmed that NBME repeatedly denied Plaintiff's requests for Step 1 accommodations, stated that the subject law firm "has a special focus on advocating on behalf of medical students with disabilities both with medical schools and against the NBME," and reported that in "recent cases[] it took federal courts ordering the NBME to provide extended testing time to medical students who, like [Plaintiff], had faced repeated denials of accommodation requests by the NBME . . . ." (Id.)  Yet, as discussed below, and even though NBME had already denied six of Plaintiff's requests

for Step 1 accommodations (ECF No. 1 ¶ 60), Plaintiff did not take legal action against NBME for another two years.

On July 13, 2020, the Medical School informed Plaintiff that it would allow him to proceed with his medical studies without repeating prior courses.  (ECF No. 14-10.)  The Medical School also informed Plaintiff that it would require him, as it requires all students, to pass Step 1 before proceeding into the final phase of the medical curriculum.[1]  (See ECF No. 14-10; see also ECF No. 14-1 § 9.2.1 (Policy Manual provision requiring students to complete Step 1 before entering phase three of the curriculum).)  The Medical School again reminded Plaintiff that he must abide by the Seven-Year Graduation Policy.[2]  (ECF No. 14-10.)  Plaintiff accordingly returned to the Medical School.  (ECF No. 1 ¶ 73.)

On August 17, 2021, the Medical School sent Plaintiff a letter in response to his request for it to allow a further delay in taking Step 1.  (ECF No. 14-11.)  That letter reaffirmed Plaintiff's obligation to take Step 1 before proceeding to the final phase of his medical studies, and thus specified that Plaintiff must pass Step 1 by September 12, 2021, given the Seven-Year Graduation Policy.  (Id.)

In October 2021, the Medical School once more reminded Plaintiff that he is subject to the Seven-Year Graduation Policy.  (ECF No. 1 ¶ 85.)  Plaintiff's counsel "sought clarification and discussions with . . . Stony Brook's Associate General Counsel" about this issue.  (Id. ¶ 90.)  Stony Brook responded by "again stating that [Plaintiff] must graduate in seven years."  (Id. ¶ 92.)

---

[1]     The Medical School divides its curriculum into three "phases": foundations, primary clinicals, and advanced clinicals.  *UGME – MD Program*, RENAISSANCE SCH. MED. STONY BROOK UNIV., https://renaissance.stonybrook medicine.edu/ugme/education/MD (last visited Feb. 5, 2024); (see ECF No. 14-1 § 2.4.1.)

[2]     The following year, in April 2021, the Medical School drafted a letter in support of Plaintiff's application for membership in the American Urological Association that inexplicably stated Plaintiff would graduate in May 2023. (ECF No. 3-10)

In March 2022, Plaintiff's counsel wrote once more to Stony Brook about the Seven-Year Graduation Policy. (Id. ¶ 93.)  Stony Brook again responded by "again stat[ing] that [Plaintiff] must finish his medical education within seven years."  (Id. ¶ 95.)

**B.    Procedural History**

### 1.  Commencement of this Action

On July 29, 2022, Plaintiff commenced this action by filing the Complaint against Stony Brook and its President, Maurie McInnis (collectively, "Defendants"), alleging that  Stony Brook's refusal to exempt Plaintiff from the Medical School's Seven-Year Graduation Policy violated Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12131 et seq. (the "ADA"), and section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794  (ECF No. 1.)  That same day, Plaintiff filed a motion for a preliminary injunction to maintain his enrollment at the Medical School beyond August 12, 2022—the date when Plaintiff's status as a student would terminate under the Seven-Year Graduation Policy.  (ECF No. 2.)

### 2.    The First Conference, Where Defendants Agreed to Temporarily Allow Plaintiff to Maintain His Enrollment

The Court held a conference with the parties on August 4, 2022.  During that conference, the undersigned asked defense counsel whether Stony Brook would allow Plaintiff to remain enrolled beyond August 12, 2022, because the Court's calendar could not accommodate a preliminary injunction hearing before that date.  (See ECF No. 33 at 6:9-13.)  Defense counsel reported that—prior to the conference—Stony Brook had agreed to allow Plaintiff to continue his enrollment through an eventual preliminary injunction hearing.  (Id. at 6:14-21; see id. at 10:5-8 (reflecting that the Court was "happy that the defendants have agreed to at least some cushion in terms of time . . . .").)  Based on Plaintiff's intent to commence a separate action against NBME to obtain his desired accommodations on Step 1, the parties' requested briefing schedule for

Plaintiff's preliminary injunction motion in this case, and the court's availability for a preliminary injunction hearing, the parties agreed that Plaintiff would remain enrolled at Stony Brook through October 14, 2022.  (See id. at 10:4-17:23.)

### 3.     Commencement of the NBME Action

On August 20, 2022, Plaintiff sued NBME to obtain, among other things, an injunction directing it to provide Plaintiff with accommodations on Step 1.  (See Sampson v. National Board of Medical Examiners, No. 22-CV-5120 (E.D.N.Y.) ("NBME Action"), ECF No. 1.)   On September 6, 2022, Plaintiff filed a motion for a preliminary injunction to obtain that relief from NBME.  (NBME Action, ECF No. 8.)  On September 12, 2022, and the Court scheduled the preliminary injunction hearing in the NBME Action for October 11, 2022.  (NBME Action, ECF No. 12.)

### 4.     The Parties' Further Agreements Allowing Plaintiff to Temporarily Maintain His Enrollment, and the Preliminary Injunction in the NBME Action

The Court held a conference with the parties in this case on October 6, 2022.  During that conference, the undersigned asked whether the parties considered allowing Plaintiff to continue his enrollment given that Plaintiff would soon litigate his preliminary injunction motion in the NBME Action.  (ECF No. 36 at 3:4-10.)  Defense counsel volunteered that Stony Brook would agree to an additional thirty-day extension of Plaintiff's enrollment.  (Id. at 3:13-24.)  The Court then directed the parties to inform the Court whether they would agree to a sixty-day extension in light of the Court's calendar constraints.  (Id. at 3:17-4:21.)  Later that day, defense counsel filed a letter consenting to a sixty-day extension of time for Plaintiff to continue his enrollment at Stony Brook.  (ECF No. 17.)

On December 2, 2022, the Court granted Plaintiff's preliminary injunction motion in the NBME Action.  See Sampson v. Nat'l Bd. of Med. Examiners, No. 22-CV-05120, 2022 WL

6

17403785, at *19 (E.D.N.Y. Dec. 2, 2022), vacated and remanded, No. 23-3, 2023 WL 3162129 (2d Cir. May 1, 2023).  NBME appealed the grant of this motion to the Second Circuit.

The Court held a conference with the parties in the instant case on December 9, 2022. During that conference, the parties reported that they "found a pathway toward resolution of this matter" that would provide Plaintiff until August 2024 to graduate from the Medical School.  (ECF No. 34 at 3:5-23.)  The parties requested until February 1, 2023, to "fine[-]tune this pathway towards resolution . . . and jointly enter into an agreement." (Id. at 3:25-4:3.)  The parties reported that they needed to negotiate and potentially undertake motion practice on the issue of attorney's fees.  (See id. at 4:15-6:10.)

On January 31, 2023, the parties reported that they "reached an impasse" in their settlement negotiations.  (ECF No. 21.)  Nonetheless, Defendants reported that they were "willing to maintain the status quo—i.e., [the Medical School] will keep Mr. Sampson enrolled as a student" until the Second Circuit adjudicated the appeal of the preliminary injunction that the Court issued in the NBME Action.  (Id.)

While NBME's appeal was pending before the Second Circuit, Plaintiff registered to take the Step 1 exam on May 15, 2023.  (See ECF No. 23.)

On May 1, 2023, the Second Circuit vacated the preliminary injunction in the NBME Action because the irreparable harm that the injunction sought to prevent—namely, Plaintiff's inability to proceed in medical school—could still occur unless Plaintiff received a favorable resolution in this case regarding the Seven-Year Graduation Policy.  See Sampson v. Nat'l Bd. of Med. Examiners, No. 23-3, 2023 WL 3162129, at *1-2 (2d Cir. May 1, 2023).  The Second Circuit's decision stressed that "the district court did not conclude—nor has Sampson offered any arguments showing—that Sampson is likely to prevail against Stony Brook or secure a favorable

7

settlement if he passes Step 1." Id. at *2; see also id. at *2 n.3 (emphasizing that "forbearance by Stony Brook, or a ruling in Sampson's favor in that case, is essential to the district court's ability to award relief to Sampson in this case against NBME").

Later that day, the parties in this case filed a joint status report in which Defendants volunteered they would "maintain the status quo and keep Mr. Sampson enrolled as a student pending the results of Mr. Sampson's May 15, 2023 Step 1 exam, should he proceed with the exam." (ECF No. 23.)

### 5.    The Parties' Final Agreement Regarding the Seven-Year Graduation Policy

The Court held a conference with the parties in this case on May 3, 2023.  During that conference, the undersigned suggested that the parties agree to the terms they raised and tentatively agreed to during the December 2022 status conference, namely, that Plaintiff be afforded until August 2024 to graduate.  (ECF No. 28 at 4:3-10.)  That course of action would allow the Court to address the irreparable harm issue raised by the Second Circuit and potentially reissue the preliminary injunction in the NBME Action after giving those parties a chance to be heard.  (See id. at 2:22-4:2.)  Defendants were "very much willing to go ahead" with that approach "as it was presented [to the Court] in December" but they would not, as Plaintiff proposed, do so through a consent decree.  (Id. at 4:16-24 (reflecting that Defendants found a consent decree "entirely inappropriate.").)  Plaintiff was "on board" with that approach if Defendants would "stipulate" to it.  (Id. at 6:10-15.)  Defendants were willing to so stipulate only if they were not responsible for Plaintiff's attorney's fees.  (See id. at 7:19-20 ("[W]e are holding fast that it has to be a no-fee agreement.").)  The Court instructed the parties to negotiate attorney's fees, directed the parties to provide an oral status update in one hour, and suggested leaving the issue of attorney's fees for the Court to resolve absent a private resolution.  (See id. at 7:21-9:15; see also id. at 6:16-24

(explaining the Court's preference to resolve Plaintiff's enrollment so that testing accommodations could be addressed in the NBME Action before Plaintiff's May 15, 2023, Step 1 exam).)

After the conference resumed, the parties reported that they agreed to the following tripartite stipulation: (1) Stony Brook would permit Plaintiff until August 12, 2024, to complete his medical education, (2) Plaintiff must pass Step 1 before proceeding to phase three of his medical education, and (3) the agreement "does not include fees" (the "Stipulation"). (Id. at 16:3-23.) The parties clarified that, under those terms, the Court would decide whether Plaintiff may recover fees and, if so, determine the fees to be awarded. (See id. at 14:25-15:15.) The Court asked the parties to file a written stipulation consistent with those terms. (Id. at 16:24-25.) Later that day, the Court "So Ordered" the written Stipulation filed by the parties. (ECF No. 25.)

### 6.    Additional Settlement Negotiations and Proceedings

On June 2, 2023, the parties requested a status conference to "proceed[] in an orderly fashion to resolve the litigation." (ECF No. 27.) The Court held that conference on June 13, 2023. Plaintiff reported a desire to address logistics for the Step 2 exam (Plaintiff had then taken Step 1 but not received his score), the residency match process, and "what the dean's letter, which is part of the residency match, would say about this litigation." (ECF No. at 35 3:9-21, 5:7-6:4.) Defendants stated that those issues were outside the scope of this litigation, which became moot once the parties entered the Stipulation. (See id. at 4:1-15.) The Court suggested that the parties further discuss these issues. (See id. at 8:18-9:24.)

The Court held a status conference on July 11, 2023. During that conference, the parties informed the Court that they were "work[ing] on a settlement agreement" that required some minor "wordsmithing." (ECF No. 37 at 2:23-3:2.) The parties also reported that they "agreed to hold

the execution of the agreement in abeyance until the Court's determination over the fee petition and any responses thereto."  (Id. at 3:2-5.)

### 7.     The Instant Motion

On October 6, 2023, consistent with their stipulated briefing schedule (see July 10, 2023 Order), the parties filed their submissions in connection with Plaintiff's instant motion for attorney's fees and costs.  (See ECF Nos. 38-42.)

## II.     LEGAL STANDARD

Under the ADA, a district court, "in its discretion, may allow the prevailing party" a "reasonable attorney's fee" as well as "litigation expenses[] and costs."  42 U.S.C. § 12205. "Congress has included the term 'prevailing party' in various fee-shifting statutes, and it has been the [Supreme] Court's approach to interpret the term in a consistent manner."  CRST Van Expedited, Inc. v. EEOC, 578 U.S. 419, 422 (2016) (citing Buckhannon Board & Care Home, Inc. v. West Virginia Dept. of Health and Human Resources, 532 U.S. 598, 603 & n.4 (2001)); see Perez v. Westchester Cty. Dep't of Corr., 587 F.3d 143, 149 n.5 (2d Cir. 2009) (holding that the standard to determine a prevailing party is "generally applicable in all cases in which Congress has authorized an award of fees to a prevailing party" (internal quotation marks omitted)).  "The 'touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties.'"  CRST, 578 U.S. at 422 (quoting Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist., 489 U.S. 782, 792 (1989)).  Any such "change must be marked by 'judicial imprimatur.'" Id. (quoting Buckhannon, 532 U.S. at 605).  One who qualifies as a prevailing party "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust."  Lefemine v. Wideman, 568 U.S. 1, 5 (2012) (quoting Hensley v. Eckerhart, 461 U.S. 424, 429 (1983)).

## III.    DISCUSSION

The parties disagree as to (among other things) the threshold issue of whether Plaintiff may recover attorney's fees and costs.  Specifically, the parties disagree as to whether the Stipulation reflects sufficient judicial imprimatur to render Plaintiff a "prevailing party" under 42 U.S.C. § 12205.[3]  (Compare Plaintiff's Memorandum in Support of Attorney's Fees and Costs ("Pl. Mem."), ECF No. 38-1 at 10-13, with Memorandum of Law In Opposition to Motion for Attorney's Fees and Costs ("Opp."), ECF No. 39 at 12-19.)  As explained below, the Court agrees with Defendants that the Stipulation lacks judicial imprimatur.  Additionally, even if Plaintiff was a prevailing party, special circumstances warrant denying Plaintiff's motion for attorney's fees and costs.  Accordingly, Plaintiff cannot recover attorney's fees and costs for this case.

### A.    The Stipulation Lacks Judicial Imprimatur

"A defendant's voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lacks the necessary judicial imprimatur on the change." Buckhannon, 532 U.S. at 605; see id. 604 n.7 (explaining that privately negotiated settlements "do not entail" judicial imprimatur).   Given that principle, a settlement agreement may confer prevailing party status "only where . . . the district court judicially sanctioned the settlement—such as by expressly retaining jurisdiction over its enforcement or incorporating the settlement terms into its order of dismissal."  Lamberty v. Connecticut State Police Union, No. 21-1275, 2022 WL

---

[3]       Plaintiff asserts, and Defendants do not dispute, that the Stipulation allowing Plaintiff to remain enrolled at Stony Brook until August 12, 2024—two years past the dismissal date under the Seven-Year Graduation Policy—provided Plaintiff the benefit he sought in this case and materially altered the parties' legal relationship, thereby satisfying the first part of the prevailing party analysis.  (See Pl. Mem., ECF No. 38-1 at 12-13; Opp., ECF No. 39 at 12-16); see also Raishevich v. Foster, 247 F.3d 337, 345 (2d Cir. 2001) (explaining that a plaintiff who obtains via agreement "the same general type" of relief sought may qualify as a prevailing party (quoting Lyte v. Sara Lee Corp., 950 F.2d 101, 104 (2d Cir. 1991))); Kahlil v. Original Old Homestead Rest., Inc., 657 F. Supp. 2d 470, 474 (S.D.N.Y. 2009) (same).  It is unnecessary for the Court to address this issue given the Court's conclusion that the requisite judicial imprimatur is absent.

319841, at *3 (2d Cir. Feb. 3, 2022) (citations omitted); <u>see</u> <u>Roberson v. Giuliani</u>, 346 F.3d 75, 80–83 (2d Cir. 2003) (finding court's retention of jurisdiction to enforce settlement reflected judicial imprimatur sufficient to confer prevailing party status on plaintiff); <u>Perez</u>, 587 F.3d at 152 (finding judicial imprimatur where, among other things, the dismissal order incorporated settlement terms).

The Stipulation lacks the judicial imprimatur necessary to render Plaintiff a "prevailing party" within the meaning of 42 U.S.C. § 12205.  In the period exceeding eight months between August 2022 and May 2023, Defendants independently, voluntarily, and continuously afforded Plaintiff what he wanted: maintaining his enrollment at the Medical School despite the Seven-Year Graduation Policy.  <u>See</u> <u>supra</u> Section I.B; <u>Garcia v. Yonkers Sch. Dist.</u>, 561 F.3d 97, 108 (2d Cir. 2009) (finding that maintaining students' enrollment absent a court order to that effect was "entirely voluntary" and "cannot serve as the basis for conferring prevailing-party status to the Students for purposes of granting attorney's fees").  During the May 3, 2023, status conference, the parties stipulated to terms continuing the status quo that they privately discussed, tentatively agreed to, and brought to the Court's attention nearly five months earlier.  <u>See</u> <u>supra</u> Section I.B.5. Indeed, the parties quickly agreed during that conference to dispose of the main issue in this case: Plaintiff's enrollment at the Medial School.[4]  (<u>See</u> ECF No. 28 at 4:3-6:15.)  The parties' eager agreement to maintain the status quo on their independently negotiated terms lacks judicial imprimatur.  <u>See</u> <u>Damiano v. City of Amsterdam</u>, 341 F. App'x 720, 721 (2d Cir. 2009) (finding settlement negotiated by the parties lacked judicial imprimatur); <u>Rodriguez-Freytas v. N.Y.C. Transit Auth.</u>, 95 F. App'x 392, 394 (2d Cir. 2004) (same); <u>Hess v. Astrue</u>, No. 09-CV-2516, 2010 WL 2710447, at *2 (E.D.N.Y. July 6, 2010) (same).

---

[4]     That the parties ultimately left the issue of attorney's fees and costs for the court to decide does not confer judicial imprimatur on the Stipulation.  <u>See</u> <u>Lamberty</u>, 2022 WL 319841, at *4.

That the Court encouraged the parties during the May 3, 2023, conference to resolve the issue of Plaintiff's enrollment at the Medical School does not compel a contrary conclusion.  See Lamberty, 2022 WL 319841, at *4 (finding mere "participation in settlement negotiations, however, is not enough to obtain prevailing party status . . . ." (citing Lopez v. City of Dallas, 328 F. App'x 944, 945–46 (5th Cir. 2009) (concluding that a "district court's participation in a telephone conference that resulted in settlement" was "not enough" to confer prevailing party status))); accord Xlear, Inc. v. Focus Nutrition, Ltd. Liab. Co., 893 F.3d 1227, 1237 (10th Cir. 2018) (similar); Toms v. Taft, 338 F.3d 519, 529 (6th Cir. 2003) (similar).  That is particularly so because the Court's encouragement primarily concerned the terms that were previously negotiated between the parties.  See Indep. Project, Inc. v. Ventresca Bros. Constr. Co., 397 F. Supp. 3d 482, 492 n.3 (S.D.N.Y. 2019) (finding no judicial imprimatur based on settlement because "the Court was not involved in [the underlying] settlement negotiations")[5]; see Hess, 2010 WL 2710447, at *2 (similar).

Finally, the fact that the Court "so ordered" the parties' resulting written stipulation is, given all the circumstances here, insufficient to confer judicial imprimatur.  Cf. Torres v. Walker, 356 F.3d 238, 245 (2d Cir. 2004) (finding insufficient judicial imprimatur where the court so ordered a stipulation without retaining jurisdiction to enforce compliance therewith); Elliott v. United States Dep't of State, 122 F. Supp. 3d 39, 43 (S.D.N.Y. 2015) (same).  The focus of the Court and the parties throughout the May 3, 2023, conference was—given Plaintiff's Step 1 exam scheduled for May 15 and the Second Circuit's analysis of irreparable harm in the NBME Action— to ensure that the parties' Stipulation was memorialized and placed on the record.  (See ECF No.

---

[5]    Ventresca Bros. Constr. separately found judicial imprimatur because, unlike here, the court expressly retained jurisdiction to enforce the settlement terms.  See 397 F. Supp. at 492 n.3.

28 at 2:15-4:2, 5:11-6:24, 9:11-15, 10:5-7, 16:3-8.)  There was no discussion of, much less concern expressed about any need for, judicial involvement in enforcing the Stipulation.  The possibility that the Court might "so order" the parties' stipulation was raised, only in passing, just before the conference concluded.  When Plaintiff's counsel asked if the stipulation should be filed "as part of a letter or a proposed order," the Court responded, "I guess it could be a proposed order."  (Id. at 17:1-4.)  This exchange—and the Court's ambivalent response therein—illustrates the Court's view that it did not matter whether the Stipulation was filed as a letter or as a proposed order. Consistent with the focus of the conference, the Court "So Ordered" the parties' Stipulation simply to memorialize it and make it part of the record.  The Court did not intend to place its imprimatur on the Stipulation.  See Perez, 587 F.3d at 153 n.8 (holding that "a district judge's own opinion as to whether or not his actions provide imprimatur" would "in a close case . . . shed light as to how ambiguous actions should be understood."); Torres, 356 F.3d at 245 n.6 (holding Buckhannon requires "evidence that a district court intended to place its 'judicial imprimatur' on the settlement" (emphasis added)).

Indeed, the mere fact that the Court "So Ordered" the parties' Stipulation is not dispositive. The case of Smyth ex rel. Smyth v. Rivero, 282 F.3d 268 (4th Cir. 2002), which the Second Circuit has cited for its judicial imprimatur analysis, is instructive.[6]  In Smyth, the Commissioner of Social Security ("Commissioner") made a "voluntary gesture" to not seek repayment of social security benefits provided before February 1, 1997, and then agreed to refrain from seeking repayment of later-provided social security benefits.  Id. at 278-79.  The district court later issued an order that

---

[6]    The Second Circuit has on three occasions cited Smyth's analysis regarding judicial imprimatur.  See Lamberty, 2022 WL 319841, at *4; Perez, 587 F.3d at 152; Roberson, 346 F.3d at 81.  A separate portion of Smyth, which held that obtaining a preliminary injunction cannot confer prevailing party status, was recently overturned but does not implicate the instant analysis. See Stinnie v. Holcomb, 77 F.4th 200, 203 (4th Cir. 2023).

dismissed the case as moot and confirmed that the Commissioner could not seek repayment of social security benefits given the parties' agreement.  Id. at 284.  The Fourth Circuit held that the district court's order did not confer judicial imprimatur on the agreement because the order was "properly interpreted as a recitation of the agreement rather than an approval and incorporation of the agreement's terms."  Id. at 284 (internal quotation marks and alterations omitted).  According to the Fourth Circuit, there was no judicial imprimatur because the order recognized that the parties' agreement, rather than the order itself, "[w]as the source of [the Commissioner's] obligation."  Id. (explaining that the order recognized "that the obligation existed . . . '[b]y agreement of the parties . . . .'").  The instant case is similar to Smyth, as the Stipulation recognized that the relevant terms took effect because "the parties stipulate[d]" to them.  (ECF No. 25.)  Smyth is not unique; other cases likewise support the Court's determination that there was no judicial imprimatur here.  Cf. Rice Servs., Ltd. v. United States, 405 F.3d 1017, 1027 (Fed. Cir. 2005) (finding court order directing defendant to provide its promised remedial action did not confer judicial imprimatur on that promise); Smith v. Fitchburg Pub. Sch., 401 F.3d 16, 27 (1st Cir. 2005) (finding ruling that defendant must undertake a specific action by a certain date lacked judicial imprimatur because "[a] closer look at the record" revealed that directive merely "require[ed] defendant] to follow through with what [it] had already voluntarily promised to do").

Contrary to Plaintiff's assertion, the instant case is not "directly on point" with Perez.  (See Pl. Mem., ECF No. 38-1 at 10.)  In Perez, the Second Circuit found judicial imprimatur because the district judge, among other things, "advised the parties on how they should expect the law to come out," suggested settlement terms, directed counsel to bring settlement offers to the parties, added to the settlement agreement that it was an "Order," added to the settlement agreement that the court could exercise jurisdiction over future related cases, and used the settlement agreement

to close the case—rendering it an "order of dismissal."  587 F.3d at 148, 152-53.  Those circumstances are not present here.  The Court did not (1) advise the parties about future legal rulings in this case[7]; (2) devise the Stipulation's substantive terms; (3) direct counsel to bring those terms back to the parties, who had already agreed on the key terms; (4) substantively alter the Stipulation submitted by the parties[8]; (5) retain jurisdiction over the Stipulation; or (6) use the Stipulation to close the case.  (ECF No. 25.)  Notably, the parties anticipate moving to dismiss this case pursuant to a separate settlement agreement.  (See ECF No. 37 at 2:23-3:5.)  Furthermore, the Order of Settlement in Perez explicitly stated that it required the "Court's approval," meaning, as the Second Circuit stressed, "the settlement was only made operative by the Court's review and approval."  587 F.3d at 152.  The Stipulation here is not so structured.  (ECF No. 25.)  Finally, the district judge in Perez explained, in his ruling on the fee motion, that he intended to place his imprimatur on the settlement.  See 587 F.3d at 153 n.8.   But here, as explained above, the Court "So Ordered" the stipulation only to memorialize it given the issues raised by the Second Circuit's decision in the NMBE Action.  Given these points, Perez is distinct from this case.

In sum, the Stipulation lacks judicial imprimatur for the reasons discussed above.

---

[7]     Plaintiff's argument that the preliminary injunction in the NBME Action shows that the Court "tipped its hand on the merits of this case" is unpersuasive given that the analysis underlying that vacated injunction in a separate action concerned different conduct by a distinct party. (Pl. Mem., ECF No. 38-1 at 12 (emphasis added)); cf. Perez, 587 F.3d at 147 (noting that the district judge "made it clear that he felt the law was on Plaintiffs' side" and "extensively probed" contrary legal arguments).

[8]     The Court merely removed that the Stipulation was "proposed." (ECF No. 25.)

16

**B.     Even if Plaintiff was a Prevailing Party, Special Circumstances Warrant Denying His Request for Attorney's Fees and Costs**

As noted above, a prevailing party may be denied fees when "special circumstances would render such an award unjust."  Lefemine, 568 U.S. at 5 (quoting Hensley, 461 U.S. at 429).  Non-prevailing parties bear the burden to make that showing.  See N.Y. State NOW v. Terry, 159 F.3d 86, 97 (2d Cir. 1998); Mid-Hudson Legal Servs., Inc. v. G & U, Inc., 578 F.2d 34, 38 (2d Cir. 1978).  The Supreme Court has offered "little guidance" as to what constitutes unjust special circumstances sufficient to deny fees to a prevailing party.  Hescott v. City of Saginaw, 757 F.3d 518, 523 (6th Cir. 2014) (internal quotation marks omitted).  The Second Circuit has identified some circumstances sufficient to deny fees to a prevailing party.[9]  But those cases "do not define the exception.  Indeed, if the special circumstances exception is to function as an equitable safety valve, its contours can emerge only on a case-by-case basis."  Vincent v. Comm'r of Soc. Sec., 651 F.3d 299, 304 (2d Cir. 2011) (internal quotation marks omitted).[10]  As explained below, even if Plaintiff was a prevailing party, the Court would find Defendants met their burden to deny Plaintiff fees given unjust special circumstances.

Defendants contend that unjust special circumstances exist because they "are simply caught in the middle of a dispute between Plaintiff and NBME"; that is, "the only reason this matter ever

---

[9]     See Vincent, 651 F.3d at 304 (explaining that such circumstances exist where the prevailing party's "own misconduct created the circumstances that led to the litigation" or "that party's contributions to the litigation's success were marginal, duplicative and unnecessary" (internal quotation marks and citations omitted)); Raishevich, 247 F.3d at 344 (explaining that such circumstances exist where "local counsel would be easily obtained due to the prospect of a significant contingency fee, and thus an award of attorneys' fees would not further the statutory purpose" (citing Kerr v. Quinn, 692 F.2d 875, 877 (2d Cir. 1982))).

[10]     The Second Circuit recognized this principle in Vincent with respect to the attorney's fee provision of the Equal Access to Justice Act ("EAJA"), but it applies to the similar attorney's fee provision of the ADA.  See United States v. 27.09 Acres of Land, 43 F.3d 769, 773-74 (2d Cir. 1994) (holding that special circumstances meriting denial of fees under the EAJA "comports with the general case law regarding attorney's fee awards" under other fee statutes likewise predicated on prevailing party status (citing Hensley, 461 U.S. at 435)); see also CRST, 578 U.S. at 422 (explaining that the Supreme Court interprets the "various fee-shifting statutes" predicated on prevailing party status "in a consistent manner").

needed to be commenced was Plaintiff's failure to take legal action against NBME in a timely manner." (Opp., ECF No. 39 at 17.)  Defendants stress that although "Plaintiff has known since 2017 that NBME did not intend to provide his requested accommodations," he still had "not sued NBME at the time he commenced this action" approximately five years later.  (Id. at 17-18); see supra Section I.A.

The Second Circuit's decision in Annunziato v. The Gan, Inc., 744 F.2d 244 (2d Cir. 1984) is illustrative.  In Annunziato, the plaintiffs brought civil rights claims arising from the sale of a school building by the City of New Haven, Connecticut for a nominal price.  See id. at 245.  At issue before the Second Circuit was whether the district court properly ordered the building's purchaser, The Gan, Inc., to pay a portion of the plaintiffs' attorney's fees after the parties entered into a settlement agreement.  See id. at 245, 248-49.  The Second Circuit found that, even though the plaintiffs were prevailing parties, special circumstances rendered an attorney fee award against The Gan, Inc. unjust.  Namely, The Gan, Inc. "was blameless with respect to the action of the City of New Haven" and was merely "an innocent third party caught in the cross-fire between plaintiffs and the City of New Haven over a municipal practice in which The Gan had no hand."  Id. at 253. The Second Circuit emphasized that "while the plaintiffs were successful in their efforts below, their objectives could have been achieved without the presence of The Gan in the litigation."  Id. at 254.

The instant circumstances are analogous to Annunziato.  Defendants—which quickly granted Plaintiff the testing accommodations he requested from them and repeatedly agreed to allow Plaintiff to remain at the Medical School after he finally confirmed he would commence, and did commence, the NBME Action (see supra Part I)—were essentially "innocent third part[ies] caught in the cross-fire" between Plaintiff and NBME as to Step 1 accommodations.  Annunziato,

18

744 F.2d at 253.  Indeed, the Medical School's Seven-Year Graduation Policy at issue here became relevant to Plaintiff only because he was dilatory in commencing the NBME Action.  See supra Part I; (see also Pl. Mem., ECF No. 38-1 at 9 (stating that, by August 2022, Plaintiff felt he had to commence this litigation to pursue the NBME Action).)

The timeline bears repeating.  In 2018, Plaintiff retained counsel to obtain Step 1 accommodations from NBME.  (ECF No. 14-6.)  By the end of 2019, NBME had denied six accommodation requests from Plaintiff.  (ECF No. 1 ¶ 60.)  In 2020, Plaintiff's counsel—who "has a special focus" on litigating against NBME—admitted in a letter to the Medical School that federal court orders are often necessary to obtain accommodations from NBME for Step 1.  (ECF No. 3-8.)  Yet, Plaintiff still waited until August 20, 2022—twenty-two days after he brought this action regarding the Seven-Year Graduation Policy and while the parties were briefing the preliminary injunction motion in the instant case—to commence the NBME Action. See supra Sections I.B.2, I.B.3.  Unlike in this case, in which Plaintiff filed a preliminary injunction motion contemporaneously with the Complaint, Plaintiff waited another seventeen days, until September 6, 2022, to seek a preliminary injunction in the NBME Action. (NBME Action, ECF No. 8.)  Moreover, not only did the Medical School "ha[ve] no hand" in NBME denying Plaintiff's Step 1 accommodation requests, Annunziato, 744 F.2d at 253, but the Medical School supported Plaintiff's application for accommodations from NBME for over five years before Plaintiff brought any suit.  (See ECF No. 3-7 (Medical School's March 27, 2017, letter to NBME); see also ECF No. 3-8 at 3 (Plaintiff's counsel acknowledging the Medical School's support of accommodations from NBME).)  Although Plaintiff's seven-year clock expired on August 12, 2022, Defendants agreed to not enforce the Seven-Year Graduation Policy while Plaintiff litigated against NBME. (See supra Section I.B.2.)  Defendants even promptly volunteered to continue to accommodate

19

Plaintiff after the Second Circuit vacated the preliminary injunction in the NBME Action.  (See supra Section I.B.4.)  As evidenced by NBME's grant of accommodations to Plaintiff in the NBME Action (see NBME Action, ECF No. 52), Plaintiff's "objectives could have been achieved without [suing Defendants]" if Plaintiff had not been dilatory in commencing the NBME Action. Annunziato, 744 F.2d at 254.

Further equitable considerations confirm that a grant of attorney's fees here would be unjust.  Since 2017, the Medical School repeatedly reminded Plaintiff of the Seven-Year Graduation Policy, and Plaintiff confirmed on multiple occasions that he understood it.  See supra Section I.A.  Yet, Plaintiff commenced this action approximately five years later, when only days remained before Plaintiff would be subject to dismissal under Seven-Year Graduation Policy.  Cf. Dimartile v. Hochul, 80 F.4th 443, 458 (2d Cir. 2023) (affirming denial of attorney's fees where "[p]laintiffs were able to obtain any relief at all in part because of the delayed initiation of their lawsuit"); Gierlinger v. Gleason, 160 F.3d 858, 882 (2d Cir. 1998) ("[T]here is no inequity in requiring counsel to bear the cost of delay caused by him or by his client."); Port Auth. Police Benevolent Ass'n, Inc. v. Port Auth. of N.Y. & N.J., No. 16-CV-3907, 2018 WL 798873, at *3 (S.D.N.Y. Jan. 23, 2018) (noting that the court would deny attorney's fees under the ADA even if plaintiff was a prevailing party because there was "something inequitable about" awarding fees in the circumstances of the case).  Thereafter, Defendants repeatedly volunteered to allow Plaintiff to remain at the Medical School while he litigated the NBME Action.  (See supra Section I.B.)  The formal Stipulation signed by both parties that was "So Ordered" by the Court was not necessary for this case given Defendants' willingness to voluntarily permit Plaintiff to remain enrolled. However, given the uncertainty as to how concrete the Medical School's promise would have to be to address the irreparable harm concern raised by the Second Circuit in the NBME Action—

and that Plaintiff's Step 1 exam was then only days away—Defendants acted promptly, agreed to the formal Stipulation, and did not object to the Court's "So Ordering" of it.  (See supra Section I.B.5; ECF No. 28.)  All of this was done to assist Plaintiff's effort to obtain accommodations from NBME for the Step 1 exam Plaintiff was scheduled to take on May 15, 2023.  (See ECF No. 28 at 2:15-8:14.)  Given all the circumstances here, an award of attorney's fees would be unjust in this case.

### IV.     CONCLUSION

For the reasons stated above, Plaintiff's motion for attorney's fees and costs is DENIED.

**SO ORDERED.**

Dated:    February 7, 2024
              Central Islip, New York

                                        /s/ JMA
                                   _____
                                   JOAN M. AZRACK
                                   UNITED STATES DISTRICT JUDGE